REPUBLIC OF PHILIPPINES by the CENTRAL BANK OF the PHILIPPINES; a Philippine Government Corporation, Plaintiff,

v.

Ferdinand E. MARCOS, et al., Defendants.

No. CV 86–146 MISC.

United States District Court, N.D. California.

Feb. 11, 1987.

---

Joseph Russoniello, U.S. Atty., George C. Stoll, Asst. U.S. Atty., San Francisco, Cal., David J. Anderson, R. John Seibert, U.S. Dept. of Justice, Washington, D.C., for U.S.

Richard A. Hibey, Timothy M. Broas, Thomas P. Steindler, Anderson, Hibey, Nauheim & Blair, Washington, D.C., John J. Bartko, Bartko, Welsh, Tarrant & Miller, San Francisco, Cal., Bert T. Kobayashi, Jr., Kobayashi, Watanabe, Sugita & Kawashima, Honolulu, Hawaii, for defendants and counterclaimant.

Richard B. Kendall, Munger, Tolles & Olson, Los Angeles, Cal., for Sedfrey Ordonez real party in interest.

OPINION AND ORDER

ORRICK, District Judge.

Ferdinand Marcos, former President of the Republic of the Philippines, is presently involved in a lawsuit in the United States District Court of Hawaii. In the course of discovery, Marcos served a subpoena on Philippine Solicitor General Sedfrey Ordonez on August 20, 1986, during a recent visit of his to San Francisco. The subpoena required Ordonez to appear for a deposition on August 25, 1986, and to bring with him certain documents. On August 22, 1986, the United States filed the present motion to quash the subpoena on the grounds that Ordonez was entitled to immunity pursuant to a "Suggestion of Immunity" issued by the United States Department of State. The Court, having considered the moving and opposition papers and having heard oral argument, grants the motion to quash the subpoena on the grounds that Ordonez is entitled to diplomatic immunity.

I

The Central Bank of the Philippines ("Central Bank") brought suit in the United States District Court of Hawaii against former President Marcos seeking the return of certain gold and currency allegedly brought by Marcos to Honolulu in violation of the Philippine export and currency laws. Marcos has filed a counterclaim in response against the Central Bank and the Republic of the Philippines to enjoin the efforts of the Central Bank to locate and seize the assets of Marcos. The United States, in its role as "custodian" of the monies, is named as a defendant in the suit, but for purposes of this motion is acting on behalf of the plaintiffs.

On August 20, 1986, Solictor General Ordonez was in San Francisco in his official capacity to deliver a speech in commemoration of the third anniversary of the assassination of Benigno Aquino, deceased husband of Corazon Aquino, President of the Republic of the Philippines. While in San Francisco, Ordonez was served by agents of Marcos with a subpoena requiring him to appear for a deposition on August 25, 1986, at 10:30 a.m. The subpoena also required him to bring with him certain documents concerning various legal proceedings in the United States, investigations in the Philippines concerning Marcos' conduct as President, and the suspension of the Philippine Constitution and the Philippine Legislature.

On August 22, 1986, the Embassy of the Philippines (the "Embassy") sent a letter to the United States Department of State ("State Department") invoking "diplomatic immunity" on behalf of Ordonez, and requesting that the United States government take the necessary steps to ensure that Ordonez was relieved of any legal obligations in connection with the present subpoena. The letter stated that Ordonez was "a Philippine Government official on a diplomatic mission." See Suggestion of Immunity by the United States, Exhibit C, filed August 22, 1986 (hereinafter cited as "Suggestion of Immunity"). The State Department, in response, sent a letter that

same day to the Attorney General stating in pertinent part:

"Solicitor General Ordonez is present in San Francisco as the representative of the Government of the Philippines in the performance of official functions of that Government. Under these circumstances, the Department believes that it would be appropriate to recognize and allow the immunity of Solicitor General Ordonez from service of process in the Northern District of California....

The Department of State would be grateful if the Department of Justice would convey these views to appropriate judicial authorities in the Northern District of California.

*See* Suggestion of Immunity, Exhibit B.

Pursuant to this letter, the United States Attorney filed a motion to quash the subpoena and presented the letters discussed above to the Court. In the meantime, Ordonez left the United States as previously scheduled and refused to appear for the deposition. However, Ordonez has indicated to the Court through his attorney that should the Court rule that he is not entitled to immunity in this instance, he would return to this country and proceed with the deposition.

## II

The government argues that Ordonez is immune from the civil jurisdiction of the Court, and that the Court must therefore quash the subpoena issued to him by Marcos. The government relies primarily upon the doctrine of foreign sovereign immunity, and the "derivative" of that immunity now treated separately as "head-of-state" immunity. Although head-of-state immunity has its origins in sovereign immunity, arising in a period when the head of state and the state itself were considered one, the doctrine is now independent of sovereign immunity and guided by separate principles. *Compare* Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* (1976) (hereinafter cited as "FSIA") *with* McDowell, 1975 Dig.U.S.Prac.Int'l L., Ch. 6, § 7, 344–45 n. 1 and accompanying text; *see also* Note, "Resolving the Confusion Over

Head of State Immunity: The Defined Rights of Kings," 86 Colum.L.Rev. 169 (1986) (hereinafter cited as "Head of State Immunity"). Although not specifically raised by the government in its papers, this Court also recognizes that the government is alternatively urging that Ordonez is entitled to "diplomatic immunity," as can be seen from the letters of the Philippine Embassy and the State Department discussed above.

### A. *Foreign Sovereign Immunity*

In arguing that the subpoena should be quashed, the government relies on cases holding that an executive "Suggestion of Immunity" under the foreign sovereign immunity doctrine is binding on the courts. The cases stand for the proposition that once the executive has submitted such a "Suggestion" to the courts, the courts are bound out of a respect for the executive's foreign policy decision to follow the Suggestion and recognize the immunity asserted. The government's reliance on these cases is misplaced.

■ First, the executive Suggestion of foreign sovereign immunity doctrine has been abrogated by the FSIA. Before the adoption of the FSIA, courts accepted as conclusive an executive determination that a foreign government was immune from suit. *Ex Parte Republic of Peru*, 318 U.S. 578, 588, 63 S.Ct. 793, 799–800, 87 L.Ed. 1014 (1943); *Spacil v. Crowe*, 489 F.2d 614 (5th Cir.1974). However, Congress became concerned that this practice was leading to the politization of sovereign immunity decisions, and that diplomatic influence rather than the application of legal criteria often determined whether a state was afforded immunity. H.R.Rep. No. 1487, 94th Cong., 2d Sess. 7, 9, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6605, 6606 (hereinafter cited as "House Report"); *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 487, 103 S.Ct. 1962, 1968, 76 L.Ed.2d 81 (1983). Accordingly, Congress enacted the FSIA to "transfer the determination of sovereign immunity from the executive branch to the judicial branch." House Report, *supra*, at 7, 1976

U.S.Code Cong. & Admin.News at 6605–06; see also 28 U.S.C. § 1602.

The government argues that the FSIA only waives sovereign immunity in certain commercial situations and, thus, is not applicable in the instant case. This is clearly incorrect. The FSIA sets forth comprehensive standards for determining when a foreign state is entitled to immunity, and vests sole responsibility for the application of those standards in the judiciary. 28 U.S.C. § 1602; *Verlinden*, 461 U.S. at 488, 103 S.Ct. at 1968. The power of the executive to determine when courts may exercise jurisdiction over foreign sovereigns has been abolished, and those cases inconsistent with the FSIA are obviously no longer persuasive.

■ Second, the sovereign immunity doctrine may not serve as a basis for Ordonez' immunity in this instance because it is not applicable to individual government officials. The FSIA provides that a "foreign state shall be immune from the jurisdiction of the courts of the United States" with certain exceptions. 28 U.S.C. § 1604. A "foreign state" is defined as "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). An "agency or instrumentality of a foreign state" is in turn defined as:

[A]ny entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States ... nor created under the laws of any third country.

*Id.* The terminology of these sections— "agency," "instrumentality," "entity," "organ"—makes it clear that the statute is not intended to apply to natural persons, except perhaps to the extent that they may personify a sovereign. Even then, it appears that the FSIA was not intended to apply to individual sovereigns, but rather that they would be covered by the separate head-of-state doctrine. House Report, *supra*, at 15–16, 21, 1976 U.S.Code Cong. & Admin.News at 6613–14, 6619. No case has been cited by either side, or found by the Court, for the contrary position. Therefore, the foreign sovereign immunity doctrine may not serve as the basis for a grant of immunity on behalf of Ordonez in this instance.

### B. *Head-of-State Immunity*

The government also argues that Ordonez is entitled to head-of-state immunity, despite the fact that he is neither a sovereign nor a foreign minister, the two traditional bases for a recognition or grant of head-of-state immunity. *The Schoooner Exchange v. McFaddon*, 11 U.S. (7 Cranch 116) 74, 86–88, 3 L.Ed. 287 (1812). The government cites two unreported cases for support of the proposition that head-of-state immunity has been recognized as applying to other government officials. The first, *Chong Boon Kim v. Kim Yong Shik*, 58 Am.J.Int'l L. 186 (Haw.Cir.Ct., Sept. 9, 1963), does not provide any help to the government in its pursuit of this argument for the simple reason that Kim Yong Shik *was* a foreign minister, and thus was entitled to avail himself of head-of-state immunity in accordance with traditional customary international law. The second case, *Kilroy v. Windsor*, No. C–78–291, slip op. (N.D.Ohio, Dec. 7, 1978) (unpublished), is likewise of little help to the government. The case fails to consider or discuss the ramifications of the FSIA, and indeed appears to base at least part of its reasoning on the now invalidated holding of *Spacil v. Crowe*, 489 F.2d 614 (5th Cir.1974). Further, the opinion places great weight on the fact that the foreign dignitary seeking immunity, Prince Charles of Wales, was "not just a foreign minister or special envoy, but the Heir Apparent to the throne of the possibly offended nation." *Kilroy*, slip op. at 3. The situation at hand does not involve considerations of the same magnitude, though obviously Ordonez is a very high ranking official of the Republic of the Philippines. Neither case cited by the government is persuasive.

■ In fact, the government in this instance seeks to expand the head-of-state doctrine to encompass all government officials of a foreign state to whom the State Department chooses to extend immunity. There is no precedent for such a radical departure from past custom, *see* Note, Head of State Immunity, *supra,* and indeed there is no need for such a step in this case. Thus, the head-of-state doctrine of immunity may also not serve as a basis for a grant or recognition of immunity on behalf of Ordonez.

### C. *Diplomatic Immunity*

The third and final potential ground for a recognition of the immunity of Ordonez is found in the doctrine of "diplomatic immunity." Although the government appears to suggest that there may exist some sort of "official immunity" as concerns upper level foreign government officials, no authority or case law has been produced that discusses such an immunity. There is, however, a rich jurisprudential and statutory history surrounding the international practice of diplomatic immunity. Prior to 1978, the existing statute on diplomatic immunity in the United States was the Act of April 30, 1790, Ch. 9, 1 Stat. 1217. This Act was replaced by the Diplomatic Relations Act of 1978, Pub.L. No. 95–393, 92 Stat. 808 (codified at 22 U.S.C. §§ 254a–254e and 28 U.S.C. §§ 1251, 1351, 1364), which established the Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, T.I.A.S. No. 7502, 500 U.N.T.S. 95 (Apr. 18, 1961) (hereinafter cited as the "Vienna Convention") "as the sole United States law on the subject." S.Rep. No. 958, 95th Cong., 2d Sess. 1, *reprinted in* 1978 U.S.Code Cong. & Admin.News 1935.

Article 31 of the Vienna Convention provides that, with certain exceptions, a diplomatic agent shall be immune from the civil jurisdiction of the "receiving" state's courts, and shall "not [be] obliged to give evidence as a witness." Article 32 states that this immunity may be waived by the "sending" state, but that the waiver must always be *express.*

Marcos has argued that the Central Bank is in reality the Republic of the Philippines

itself and, therefore, any immunity in the Philippines' diplomatic agents has been waived by the institution of this lawsuit. Chief Judge Fong of the United States District Court of Hawaii has yet to rule whether the Republic of the Philippines is a "real party in interest," but the result in the present motion before this Court will be the same regardless of that ruling. A sending state does not waive any and all diplomatic immunity for its agents merely through the institution of a suit in the receiving state. This proposition is evident throughout the provisions of the Vienna Convention, now United States law. Indeed, were this not so, a sending state would be required to endanger and possibly forego the maintenance of a healthy diplomatic dialogue with the receiving state whenever the sending state wished to avail itself of the protections and privileges of the receiving state's legal system. Such a result would be absurd as well as dangerous, and no case has been found supporting this argument.

■ Absent express waiver by the Philippines, the institution of this suit will not waive any diplomatic immunity in those agents of the Philippines entitled to such immunity. Thus, if Ordonez is found to qualify as a diplomatic agent, he is entitled to all the privileges and immunities accorded any other such agent under the Vienna Convention, and the subpoena requiring his presence at the deposition must be quashed. Indeed, the legislative history of the FSIA itself contemplates just such a course of action in stating that "if a plaintiff sought to depose a diplomat in the United States or a high-ranking official of a foreign government, diplomatic and official immunity would apply.... [A]ppropriate remedies would be available under Rule 37 of the Federal Rules of Civil Procedure for an unjustified failure to make discovery." House Report, *supra,* at 23, 1976 U.S.Code Cong. & Admin.News at 6622. Although neither side, nor the Court, has been able to find any authority for "official" immunity, there exists ample authority for diplomatic immunity to prevent the attempted

deposition of Ordonez if he qualifies for such immunity.

■ Unlike sovereign immunity, whether a diplomatic agent is entitled to diplomatic immunity is a matter for the State Department to decide. For the courts, "It is enough that the [sending state] has requested immunity, that the State Department has recognized that the person for whom it was requested is entitled to it, and that the State Department's recognition has been communicated to the court." *Carrera v. Carrera*, 174 F.2d 496, 497 (D.C.Cir.1949). Although some have asserted that the State Department's decisions are reviewable by the courts, "the courts have generally accepted as conclusive the views of the State Department as to the fact of diplomatic status." *Abdulaziz v. Dade County*, 741 F.2d 1328, 1331 (11th Cir.1984). *But see Vulcan Iron Works, Inc. v. Polish American Machinery Corp.*, 479 F.Supp. 1060, 1067–68 (S.D. N.Y.1979) (the State Department's discretion to accept or deny notification of diplomatic status is not unlimited). In addition, once the State Department has certified diplomatic status, "the diplomatic immunity flowing from that status serves as a defense to suits *already* commenced." *Abdulaziz,* 741 F.2d at 1329–30 (emphasis added).

■ Marcos argues that the State Department cannot certify Ordonez as a diplomatic agent after he has already entered the country and been served with a subpoena. Marcos points to the notification requirements of Article 10 of the Vienna Convention, and has submitted a declaration that Ordonez was not on any State Department list of certified diplomatic agents of the Philippines at the time the subpoena was served. The language of Article 10 states that "[w]here possible, prior notification of arrival and final departure [of the diplomatic agent] shall ... be given." The notification requirement does not state a deadline, and indeed contemplates notification occurring after the agent has entered the receiving state. Further, Article 39 states that an agent is entitled to immunity at the moment of noti-

fication to the proper authorities, *even if* he or she is already in the receiving state's territory. This language, in combination with the *Abdulaziz* holding that immunity can be granted at any time and still serve as a defense to suits already commenced, provides convincing authority that immunity may be granted after entry into this country.

### III

■ The central issue in this motion is whether the letter from the State Department constitutes certification of Ordonez' diplomatic status. Although the letter does not expressly certify Ordonez as a diplomat, when read in light of the circumstances surrounding this subpoena and with regard to the letter from the Philippine Embassy, there is sufficient evidence for the Court to find that the State Department evinced a clear intent to grant diplomatic status to Ordonez. The State Department's letter, issued the same day as the Philippine request, refers to the Embassy's request for *diplomatic* immunity as a request for "immunity"; this careless lack of specificity by the State Department is repeated throughout their letter. Yet, the State Department's does state that Ordonez was here in this country as a "representative" of the Philippine government, that he was here to perform "official functions," and that the "Department believes that it would be appropriate to recognize and allow the immunity" of Ordonez. The letter of the Embassy specifically requested *diplomatic* immunity, and in response to that request the State Department agreed and drafted the appropriate letter. *See* Suggestion of Immunity, Exhibits B and C.

Despite the carelessness of the State Department's letter, in light of all the evidence submitted, this Court finds that the State Department has provided the Court with a letter certifying Ordonez as a diplomatic agent and requesting diplomatic immunity on his behalf. Out of respect for the foreign policy decisions of the Executive Branch, this Court finds that Ordonez is entitled to diplomatic immunity. *See Ab-*

800

*dulaziz,* 741 F.2d at 1331; *Carrera,* 174 F.2d at 497. Accordingly,

IT IS HEREBY ORDERED that Solicitor General Ordonez is a diplomatic agent, as recognized by the United States Department of State, and as such is entitled to all the privileges of the Vienna Convention, including immunity from civil jurisdiction and any requirement that he give evidence as a witness or otherwise. Therefore, the motion to quash the subpoena is granted, and Ordonez is under no obligation to obey or respect the terms of the subpoena.