Vincente B. CHUIDIAN,
Plaintiff–Appellant,

v.

PHILIPPINE NATIONAL
BANK, Defendant,

and

Raul Daza, Defendant–Appellee.

Vincente B. CHUIDIAN,
Plaintiff–Appellee,

and

Philippine Export and Foreign Loan
Guarantee Corporation, Intervenor,

v.

PHILIPPINE NATIONAL
BANK, Defendant,

and

Raul Daza, Defendant–Appellant.

Nos. 88–6146, 88–6481.

United States Court of Appeals,
Ninth Circuit.

Argued May 9, 1990.

Submitted May 16, 1990.

Aug. 29, 1990.

See also 734 F.Supp. 415.

Steven C. Finley, San Francisco, Cal., for plaintiff-appellant-cross-appellee.

Benjamin George Williams, Santa Monica, Cal., for defendant-appellee-cross-appellant.

Before WALLACE, THOMPSON and O'SCANNLAIN, Circuit Judges.

WALLACE, Circuit Judge:

Chuidian, a Philippine citizen, sued Daza, a Philippine citizen and an official of the Philippine government, after Daza instructed the Philippine National Bank (Bank) to dishonor a letter of credit issued by the Republic of the Philippines to Chuidian. The district court dismissed for lack of subject matter jurisdiction, and Chuidian timely appeals. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

I

Chuidian owns interests in various businesses in California. In 1985, the Philippine Export and Foreign Loan Guarantee Corporation (Guarantee Corporation), an instrumentality of the Republic of the Philippines government under then-President Ferdinand Marcos, sued several of Chuidian's companies in Santa Clara County Superior Court. Chuidian counterclaimed. The parties settled the Santa Clara County litigation in late 1985. As part of the settlement, the Bank, a state-owned bank, issued an irrevocable letter of credit to Chuidian on behalf of the Guarantee Corporation, payable at the Bank's Los Angeles branch.

Shortly thereafter, on February 26, 1986, the government of President Marcos was overthrown, and replaced by the current government of President Corazon Aquino. The new regime formed the Presidential Commission on Good Government (Commission), an executive agency charged with recovering "ill-gotten wealth" accumulated by Marcos and his associates. Philippine Executive Order No. 1, § 2(a) (Feb. 28, 1986). The Commission was given the authority "[t]o enjoin or restrain any actual or threatened commission of acts by any person or entity that may render moot and academic, or frustrate, or otherwise make ineffectual the efforts of the Commission...." *Id.*, § 3(d).

Daza was a duly appointed member of the Commission. In March 1986, acting pursuant to section 3(d) of the executive order, Daza instructed the Bank not to make payment on the letter of credit issued to Chuidian. According to Daza, the Commission suspected that Marcos and Chuidian had entered into a fraudulent settlement of the Santa Clara County litigation to pay off Chuidian for not revealing certain facts about Marcos's involvement in Chuidian's business enterprises. As a result, the Commission wished to examine the propriety of the settlement, and, in order to secure payment in the event of a decision against Chuidian, needed to prevent payment under the letter of credit.

When the Bank, pursuant to Daza's order, refused to make payment under the letter of credit, Chuidian sued the Bank in Los Angeles County Superior Court. The Bank removed the action to federal district court pursuant to 28 U.S.C. § 1441(d). Chuidian later added as defendants Daza and several other individuals, asserting intentional interference in his contractual relations with the Bank.

In an unrelated action, the Guarantee Corporation sought to reopen the Santa Clara County litigation and set aside the settlement giving rise to the letter of credit. Like Daza, the Guarantee Corporation asserted that the settlement was the product of a collusive arrangement between Chuidian and Marcos. The Guarantee Cor-

poration also intervened in Chuidian's suit against Daza, arguing that Chuidian should not recover because the settlement giving rise to the letter of credit was invalid.

After protracted procedural maneuvering, Daza moved to dismiss on grounds of defective service of process and sovereign immunity. Daza also moved for sanctions pursuant to rule 11, Fed.R.Civ.P. The district court granted the motion to dismiss, holding that Daza had sovereign immunity for acts committed in his official capacity as a member of the Commission, and that Chuidian's allegations that Daza had acted beyond his authority lacked merit. The court denied Daza's request for rule 11 sanctions. Chuidian appeals from the dismissal, and Daza cross-appeals from the denial of sanctions.

## II

The parties agree that absent a finding of sovereign immunity, the district court had subject matter jurisdiction to consider Chuidian's claims. Nevertheless, because the question is one of first impression in this circuit and is sufficiently in doubt, we determined that it should be considered by us sua sponte.

Chuidian and Daza are both citizens of the Philippines. Therefore, no diversity jurisdiction exists. *See* 28 U.S.C. § 1332. Likewise, Chuidian's underlying claims do not present a federal question. *See* 28 U.S.C. § 1331.

■ Federal courts have jurisdiction over suits against foreign sovereigns under the Foreign Sovereign Immunity Act, 28 U.S.C. §§ 1602–1611 (Act), even where the parties are not diverse and the underlying claims do not present a federal question. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 489–94, 103 S.Ct. 1962, 1969–74, 76 L.Ed.2d 81 (1983) (*Verlinden*); 28 U.S.C. § 1330(a). Nevertheless, we do not base our jurisdiction on the Act. To do so would be insufficient for this case because some of the claims presented do not raise an issue of sovereign immunity. For those which do involve sovereign acts, the district court did not rely upon the Act, and the parties dispute whether it applies. We

need not resolve this question since a more secure basis for jurisdiction exists which places the entire controversy properly before us without regard to the applicability of 28 U.S.C. § 1330(a).

■ The claim against Daza's co-defendant, the Bank, is properly in federal court pursuant to 28 U.S.C. § 1441(d). At all relevant times, the Philippine government owned a majority interest in the Bank. Thus, the Bank qualifies as an "agency or instrumentality of a foreign state" under 28 U.S.C. § 1603(b). *See* 28 U.S.C. § 1608(b)(2). Section 1441(d) provides that in any state court action against a foreign state (including an agency or instrumentality of a foreign state), the foreign state may remove the proceeding to federal court. We have not previously considered whether removal pursuant to section 1441(d) transfers the entire action or only the claim against the removing entity. We now decide that jurisdictional issue.

■ The Fifth Circuit faced an identical question in *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371, 1375 (5th Cir.1980) (*Arango*). Arango stated a claim against Dominicana, an instrumentality of the government of the Dominican Republic, and several private parties. Dominicana removed pursuant to section 1441(d). The Fifth Circuit held that where a sovereign defendant in a multi-party suit removes under section 1441(d), "the entire action against all defendants accompanies it to federal court." *Id.* at 1375. The court relied upon two passages from the legislative history of section 1441(b). First, Congress spoke of removal of "the action" rather than of "the claim," suggesting that removal would not effect a separation of the claims. Second, Congress acknowledged that co-defendants might be involuntarily removed under section 1441(d). "New subsection (d) of section 1441 permits the removal of any such *action* at the discretion of the foreign state, even if there are multiple defendants *and some of these defendants desire not to remove the action.*" H.R.Rep. No. 94–1487, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code Cong.

& Admin.News 6604, 6631 (emphasis added) (House Report). The Fifth Circuit reasoned that such involuntary removal could occur only if section 1441(d) envisioned removal of the entire action. *Arango,* 621 F.2d at 1375.

We agree with the reasoning of the Fifth Circuit and hold that section 1441(d) requires, in the case of a removal by a foreign sovereign, that the federal court initially exercise jurisdiction over claims against co-defendants even if such claims could not otherwise be heard in federal court. Thus, the proper removal by Daza's co-defendant Bank also transferred the claims against Daza to federal court, without regard to whether the Act provides an independent basis for hearing those claims. Therefore, given that the claims were properly in federal court, we next consider whether the Act or some other form of sovereign immunity barred adjudication on the merits.

### III

 The central issue in this appeal is whether Daza is entitled to sovereign immunity for acts committed in his official capacity as a member of the Commission. Daza argues that he qualifies as an "agency or instrumentality of a foreign state," 28 U.S.C. § 1603(b), and hence is entitled to immunity pursuant to the Act, 28 U.S.C. § 1604. Chuidian contends either that Daza is not covered by the Act, or, in the alternative, that this case falls within the exceptions to immunity expressly provided by the Act. *See* 28 U.S.C. §§ 1605–07. The government, in a "Statement of Interest of the United States," takes a third position. Under the government's view, Daza is not covered by the Act because he is an individual rather than a corporation or an association, but he is nevertheless entitled to immunity under the general principles of sovereign immunity expressed in the Restatement (Second) of Foreign Relations Law § 66(b).

### A.

We initially consider whether the Act applies to an individual such as Daza acting in his official capacity as an employee of a foreign sovereign. Resolution of this issue necessitates a brief recitation of the evolution of the law of sovereign immunity.

At first, United States courts, applying federal common law, adhered to an absolute view of sovereign immunity under which a foreign state enjoyed immunity from all suits in federal court. *See The Schooner Exchange v. McFaddon,* 11 U.S. (7 Cranch) 116, 136, 3 L.Ed. 287 (1812). More recently, however, the prevailing view in international law shifted to the so-called "restrictive" form of sovereign immunity: immunity would attach only to inherently governmental or "public" acts of a state. Non-governmental or "private" activities, such as a state's commercial enterprises, would be subject to suit in foreign courts. In 1952, in keeping with prevailing international practice, our State Department announced in the so-called Tate Letter that it would henceforth advise United States courts not to apply sovereign immunity to non-governmental activities of foreign states. *See* Tate, *Changed Policy Concerning the Granting of Sovereign Immunity to Foreign Governments,* 26 Dep't St.Bull. 984–85 (1952), *reprinted in Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 711–15, 96 S.Ct. 1854, 1869–71, 48 L.Ed.2d 301 (1976); *see generally Verlinden,* 461 U.S. at 487–88, 103 S.Ct. at 1968 (reciting historical background); *West v. Multibanco Comermex, S.A.,* 807 F.2d 820, 823–24 (9th Cir.) (same), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2483, 96 L.Ed.2d 375 (1987).

Subsequent to the Tate letter, courts in the United States formally adopted the restrictive view of sovereign immunity. The principles of this approach were collected in the Restatement (Second) of Foreign Relations Law § 65 *et seq.* (1965). According to the Restatement, immunity extended to:

(a) the state itself;

(b) its head of state ...;

(c) its government or any governmental agency;

(d) its head of government ...;

(e) its foreign minister ...;

(f) any other public minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state[.]

Restatement (Second), § 66.

In practice, however, the determination of whether a suit was barred under the principles of the Restatement was made not by the courts but by the State Department. Typically, a foreign state or instrumentality faced with a suit in a court in our country would apply to the State Department for a finding of immunity. The State Department would make a determination, considering the common law principles expressed in the Restatement, and would convey the finding to the relevant court by filing a "suggestion." In fact, however, the courts treated such "suggestions" as binding determinations, and would invoke or deny immunity based upon the decision of the State Department. *See Ex parte Republic of Peru*, 318 U.S. 578, 589, 63 S.Ct. 793, 800, 87 L.Ed. 1014 (1943) (*Ex parte Peru*); Restatement (Second), § 69 note 1.

During the 1970s, Congress became concerned that the law of sovereign immunity under the practice of the Tate letter was leaving immunity decisions subject to diplomatic pressures rather than to the rule of law. In Congress's view,

The Tate letter ... has posed a number of difficulties. From a legal standpoint, if the Department applies the restrictive principle in a given case, it is in the awkward position of a political institution trying to apply a legal standard to litigation already before the courts....

From a foreign relations standpoint, the initiative is left to the foreign state.... From the standpoint of the private litigant, considerable uncertainty results. A private party who deals with a foreign government entity cannot be certain that his legal dispute with a foreign sovereign will not be decided on the basis of nonlegal considerations through the foreign government's intercession with the Department of State.

House Report at 6607.

As a result, in 1976 Congress enacted the Act, largely codifying the existing common law of sovereign immunity. The principal change envisioned by the statute was to remove the role of the State Department in determining immunity. Sovereign immunity could be obtained only by the provisions of the Act, and only by the courts interpreting its provisions; "suggestions" from the State Department would no longer constitute binding determinations of immunity. *See id.* at 6605–06.

The Act is "the sole basis for obtaining [subject matter] jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989) (*Amerada Hess*); *Liu v. Republic of China*, 892 F.2d 1419, 1424 (9th Cir. 1989). Therefore, if Daza is considered a "foreign state" for purposes of the Act, our decision on immunity must be based upon the provisions of that statute.

The Act, 28 U.S.C. § 1603, provides:

For purposes of this chapter—

(a) A "foreign state" ... includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States ... nor created under the laws of any third country.

The government and Chuidian argue that the definition of "agency or instrumentality of a foreign state" in section 1603(b) includes only agencies, ministries, corporations, and other associations, and is not meant to encompass individuals. Such a reading draws some significant support

from the legislative history of section 1603(b), which reads in part:

The first criterion [section 1603(b)(1) ] ... is intended to include a corporation, association, foundation or any other entity which, under the law of the foreign state where it was created, can sue or be sued in its own name....

The second criterion [section 1603(b)(2) ] requires that the entity be either an organ of a foreign state ... or that a majority of the entity's shares or other ownership interest be owned by a foreign state....

As a general matter, entities which meet the definition of an "agency or instrumentality of a foreign state" could assume a variety of forms, including a state trading corporation, a mining enterprise, a transport organization such as a shipping line or airline, a steel company, a central bank, an export association, a governmental procurement agency or a department or ministry....

House Report at 6614.

This language from the House Report indicates that Congress was primarily concerned with *organizations* acting for the foreign state, and may not have expressly contemplated the case of *individuals* acting as sovereign instrumentalities. At least one court has so concluded. *Republic of the Philippines v. Marcos*, 665 F.Supp. 793, 797 (N.D.Cal.1987) (*Marcos*) ("The terminology of [section 1603(b) ]—'agency', 'instrumentality', 'entity', 'organ'—makes it clear that the statute is not intended to apply to natural persons.").

Chuidian and the United States thus argue that Daza's immunity cannot be evaluated under the provisions of the Act. Chuidian argues that Daza therefore cannot be granted immunity: the Act provides the sole source of sovereign immunity, and Daza does not qualify under its definition of a foreign state. The government, on the other hand, urges us to apply the pre-Act common law of immunity. In its view, the Act replaces common law only in the context of "foreign states" as defined by section 1603(b); elsewhere—i.e., for entities covered by the common law but not cover-

ed by the Act—common law principles remain valid. The government further argues that Daza is immune under the common law principles of the Second Restatement; Chuidian contends that even if the old common law applies, an exception to immunity is applicable.

We are persuaded by neither of these arguments. While section 1603(b) may not explicitly include individuals within its definition of foreign instrumentalities, neither does it expressly exclude them. The terms "agency," "instrumentality," "organ," "entity," and "legal person," while perhaps more readily connoting an organization or collective, do not in their typical legal usage necessarily exclude individuals. Nowhere in the text or legislative history does Congress state that individuals are *not* encompassed within the section 1603(b) definition; indeed, aside from some language which is more commonly associated with the collective, the legislative history does not even hint of an intent to exclude individual officials from the scope of the Act. Such an omission is particularly significant in light of numerous statements that Congress intended the Act to codify the existing common law principles of sovereign immunity. As pointed out above, pre–1976 common law expressly extended immunity to individual officials acting in their official capacity. If in fact the Act does not include such officials, the Act contains a substantial unannounced departure from prior common law.

The most that can be concluded from the preceding discussion is that the Act is ambiguous as to its extension to individual foreign officials. Under such circumstances, we decline to limit its application as urged by Chuidian and the government. We conclude that the consequences of such a limitation, whether they be the loss of immunity urged by Chuidian or the reversion to pre-Act common law as urged by the government, would be entirely inconsistent with the purposes of the Act.

It is generally recognized that a suit against an individual acting in his official capacity is the practical equivalent of a suit against the sovereign directly. *Monell v.*

*Department of Social Services,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent."); *Morongo Band of Mission Indians v. California State Board of Equalization,* 858 F.2d 1376, 1382 n. 5 (9th Cir.1988) ("A claim alleged against a state officer acting in his official capacity is treated as a claim against the state itself."), *cert. denied,* 488 U.S. 1006, 109 S.Ct. 787, 102 L.Ed.2d 779 (1989). Thus, to take Chuidian's argument first, we cannot infer that Congress, in passing the Act, intended to allow unrestricted suits against individual foreign officials acting in their official capacities. Such a result would amount to a blanket abrogation of foreign sovereign immunity by allowing litigants to accomplish indirectly what the Act barred them from doing directly. It would be illogical to conclude that Congress would have enacted such a sweeping alteration of existing law implicitly and without comment. Moreover, such an interpretation would defeat the purposes of the Act: the statute was intended as a comprehensive codification of immunity and its exceptions. The rule that foreign states can be sued only pursuant to the specific provisions of sections 1605–07 would be vitiated if litigants could avoid immunity simply by recasting the form of their pleadings.

Similarly, we disagree with the government that the Act can reasonably be interpreted to leave intact the pre–1976 common law with respect to foreign officials. Admittedly, such a result would not effect the sweeping changes which would accompany the rule suggested by Chuidian: the government merely proposes that immunity of foreign states be evaluated under the Act and immunity of individuals be evaluated under the (substantially similar) provisions of the Second Restatement. Nevertheless, such a rule would also work to undermine the Act.

The principal distinction between pre–1976 common law practice and post–1976 statutory practice is the role of the State Department. If individual immunity is to be determined in accordance with the Second Restatement, presumably we would once again be required to give conclusive weight to the State Department's determination of whether an individual's activities fall within the traditional exceptions to sovereign immunity. *See Ex Parte Peru,* 318 U.S. at 589, 63 S.Ct. at 800; Restatement (Second) § 69 note 1. As observed previously, there is little practical difference between a suit against a state and a suit against an individual acting in his official capacity. Adopting the rule urged by the government would promote a peculiar variant of forum shopping, especially when the immunity question is unclear. Litigants who doubted the influence and diplomatic ability of their sovereign adversary would choose to proceed against the official, hoping to secure State Department support, while litigants less favorably positioned would be inclined to proceed against the foreign state directly, confronting the Act as interpreted by the courts without the influence of the State Department.

Absent an explicit direction from the statute, we conclude that such a bifurcated approach to sovereign immunity was not intended by the Act. First, every indication shows that Congress intended the Act to be comprehensive, and courts have consistently so interpreted its provisions. *Amerada Hess,* 109 S.Ct. at 688 ("[T]he text and structure of the [Act] demonstrate Congress' intention that the [Act] be the *sole* basis for obtaining jurisdiction over a foreign state in our courts.") (emphasis added). Yet the rule urged by the government would in effect make the statute optional: by artful pleading, litigants would be able to take advantage of the Act's provisions or, alternatively, choose to proceed under the old common law.

Second, a bifurcated interpretation of the Act would be counter to Congress's stated intent of removing the discretionary role of the State Department. *See* House Report at 6605–06. Under the government's interpretation, the pre–1966 common law would apply, in which the State Department had a discretionary role at the option of the litigant. But the Act is clearly intended as a

mandatory rather than an optional procedure. To convert it to the latter by allowing suits against individual officials to proceed under the old common law would substantially undermine the force of the statute. There is no showing that Congress intended such a limited effect in passing a supposedly comprehensive codification of foreign sovereign immunity.

Furthermore, no authority supports the continued validity of the pre–1976 common law in light of the Act. Indeed, the American Law Institute recently issued the Restatement (Third) of Foreign Relations Law, superseding the Second Restatement relied upon by the government in this action. The new restatement deletes in its entirety the discussion of the United States common law of sovereign immunity, and substitutes a section analyzing such issues exclusively under the Act. Restatement (Third) of Foreign Relations Law, §§ 451 *et seq.* (1986).

For these reasons, we conclude that Chuidian's suit against Daza for acts committed in his official capacity as a member of the Commission must be analyzed under the framework of the Act. We thus join the majority of courts which have similarly concluded that section 1603(b) can fairly be read to include individuals sued in their official capacity. *Kline v. Kaneko*, 685 F.Supp. 386, 389 (S.D.N.Y.1988) ("The [Act] does apply to individual defendants when they are sued in their official capacity."); *American Bonded Warehouse Co. v. Compagnie Nationale Air France*, 653 F.Supp. 861, 863 (N.D.Ill.1987) ("Defendants Francois Bachelet and Joe Miller, sued in their respective capacities as employees of Air France [an instrumentality of the government of France], are also protected by the [Act]."); *Mueller v. Diggelman*, No. 82 CIV 5513 (S.D.N.Y.1983) (LEXIS, gen-fed library, dist. file) (judges and clerks of foreign court, sued in their official capacities, entitled to immunity under the Act); *Rios v. Marshall*, 530 F.Supp. 351, 371, 374 (S.D.N.Y.1981) (official of British West Indies Central Labour Organization, an instrumentality of the British West Indies, protected under the Act); *but see Marcos*, 665

F.Supp. at 797 (Act not applicable to Philippine solicitor general).

### B.

The Act states that a foreign sovereign is immune from the jurisdiction of United States courts except in cases satisfying certain statutorily defined exceptions. 28 U.S.C. §§ 1330(a), 1605–07. Chuidian argues that three exceptions are applicable here: the waiver exception, 28 U.S.C. § 1605(a)(1), the "takings" exception, 28 U.S.C. § 1605(a)(3), and the torts exception, 28 U.S.C. § 1605(a)(5). (Chuidian also argued in the district court for the commercial activities exception, 28 U.S.C. § 1605(a)(2); he does not press this argument on appeal.) We address each exception in turn.

### 1.

Section 1605(a)(1) provides that "A foreign state shall not be immune from the jurisdiction of the Courts of the United States ... in any case in which the foreign state has waived its immunity either explicitly or by implication...." According to Chuidian, Daza's immunity was implicitly waived because the Bank and the Guarantee Corporation participated in this action, allegedly without raising the sovereign immunity defense. Since the Bank and the Guarantee Corporation are both instrumentalities of the Republic of the Philippines, Chuidian argues that their participation should waive the immunity of other Philippine instrumentalities, including Daza. *See Joseph v. Office of the Consulate General of Nigeria*, 830 F.2d 1018, 1022 (9th Cir. 1987) (implicit waiver may be found where "a foreign state has filed a responsive pleading in a case without raising the defense of sovereign immunity.") (internal quotation omitted), *cert. denied*, 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988).

We see no need to decide whether the Bank and the Guarantee Corporation have in fact waived sovereign immunity. It is uncontested that Daza has no official ties with either institution, aside from working for the same government. The Bank and the Guarantee Corporation are state-owned

commercial enterprises, while Daza is employed by the Commission, an executive agency involved in political and financial matters. Chuidian urges us to hold that a waiver by one foreign instrumentality simultaneously waives immunity for all other instrumentalities of the same state, even though the instrumentalities are wholly unrelated. But to adopt such a cavalier disregard for the separate juridical existence of foreign instrumentalities is unwarranted and contrary to existing law and policy.

In a slightly different context, the Supreme Court has instructed us on the need to respect the separateness of foreign instrumentalities. In *First National City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec)*, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (*Bancec*), Bancec brought suit on a letter of credit issued by First National City Bank (now Citibank). Citibank counterclaimed, asserting a right to set off the value of assets seized by the Cuban government. Bancec asserted sovereign immunity. The court ultimately rejected this defense, but nonetheless cautioned against "[f]reely ignoring the separate status of government instrumentalities." "Due respect for the actions taken by foreign sovereigns and for principles of comity between nations leads us to conclude ... that government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *Id.* at 626–27, 103 S.Ct. at 2599–2600 (citation omitted). The Court found support for its conclusion in the legislative history of section 1610(b) of the Act, which generally prohibits execution against the property of one instrumentality to satisfy a judgment against another. The legislative history on section 1610 states in part:

> Section 1610(b) will not permit execution against the property of one agency or instrumentality to satisfy a judgment against another, unrelated agency or instrumentality. There are compelling reasons for this. If U.S. law did not respect the separate juridical identities of different agencies or instrumentalities, it might encourage foreign jurisdictions to disregard the juridical divisions between different U.S. corporations or between a U.S. corporation and its independent subsidiary.

House Report at 6628–29 (citation omitted), *quoted in Bancec*, 462 U.S. at 627–28, 103 S.Ct. at 2600–01. The Court concluded that, as a general rule, the policies opposing execution upon one instrumentality for judgments against another similarly militated against allowing suits against one instrumentality for the wrongs of another. *Bancec*, 462 U.S. at 626–28, 103 S.Ct. at 2599–01.

Thus, a person injured by the Guarantee Corporation could not assert a claim against Daza, nor could the holder of a judgment against the Guarantee Corporation execute upon property belonging to Daza, even though both are instrumentalities of the Republic of the Philippines. The policies identified in *Bancec* similarly lead us to conclude that any waiver of immunity by the Guarantee Corporation or the Bank should not operate against Daza. The Republic of the Philippines has established these instrumentalities as separate juridical entities, and absent allegations of fraudulent purposes, *see id.* at 629, 103 S.Ct. at 2601, we must treat them as such.

Practical considerations also support our decision. Different foreign instrumentalities may have different abilities to claim sovereign immunity. In this case, for example, one may easily imagine a situation in which Daza would have immunity but the Bank or the Guarantee Corporation would not. The Guarantee Corporation and the Bank, as commercial enterprises, may lack immunity under the commercial activities exception, 28 U.S.C. § 1605(a)(2). Daza, on the other hand, as a purely political actor clearly would not be denied immunity under the commercial exception. Under Chuidian's view of the law, the Bank would nevertheless be required to assert a frivolous defense of sovereign immunity to avoid waiving Daza's immunity. Because there is no showing that Congress intended such a result, we are satisfied that only Daza (or his sovereign), and not juridically separate Philippine instrumentalities, can

waive Daza's immunity. Chuidian does not contend that any action by Daza himself amounts to an implied waiver. Therefore, we hold that section 1605(a)(1) is inapplicable.

2.

■ Chuidian next asserts that preventing payment under his letter of credit amounted to a taking of property in violation of the United States Constitution, and that immunity is therefore not appropriate. As explained above, any exception to sovereign immunity must arise from the provisions of the Act. The Act does contain a "takings" exception: section 1605(a)(3) states that immunity does not extend to cases "in which rights in property taken *in violation of international law* are in issue." (Emphasis added.) Thus, even if Chuidian could demonstrate a taking under United States law, section 1605(a)(3) would not apply unless the taking also violated international law.

Expropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law. *De Sanchez v. Banco Central de Nicaragua,* 770 F.2d 1385, 1396–98 (5th Cir.1985) (*De Sanchez*); *Dreyfus v. Von Finck,* 534 F.2d 24, 30–31 (2d Cir.), *cert. denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976). Chuidian is a citizen of the Republic of the Philippines, the state which, through its agent Daza, allegedly confiscated Chuidian's property. Hence, even if Daza's actions did constitute a taking, they did not contravene international law. Therefore, section 1605(a)(3) cannot provide an exception to immunity.

3.

■ Finally, Chuidian asserts that the prevention of payment constituted a tort for which immunity is denied under section 1605(a)(5). That section provides an exception to immunity for losses "occurring in the United States and caused by the tortious act or omission of [a] foreign state or any official or employee of that foreign state while acting within the scope of his office or employment." However, if

Daza's action is properly characterized as a taking rather than a tort, it is not cognizable under section 1605(a)(5).

We have previously rejected litigants' attempts to recharacterize takings claims as tort claims. In *Myers v. United States,* 323 F.2d 580 (9th Cir.1963), the government allegedly damaged plaintiffs' property during the construction of a road. Plaintiffs brought an action for trespass and waste under the Federal Tort Claims Act (FTCA), which permits suits against the government under circumstances similar to section 1605(a)(5). We held that plaintiffs' recharacterization of their takings claim did not allow them to proceed under the FTCA.

It is clear to us that the claims of the appellants asserted against the United States are to recover damages for the taking for public use of property claimed to be owned by the appellants.... The repeated characterization by the appellants of the taking by the United States as one of trespass and the commission of waste ... does not convert the claims to cases sounding in tort and thereby confer jurisdiction on the District Court under the Federal Tort Claims Act. The Fifth Amendment to the Constitution prohibits the taking of private property for public use without just compensation. To us the claims of appellants against the United States are founded upon the Constitution, and the acts of the United States complained of are in the nature of inverse condemnation.

*Id.* at 583.

The Fifth Circuit applied *Myers* in the international context in *De Sanchez,* 770 F.2d at 1398–99, a case factually similar to the present one. De Sanchez, an associate of former Nicaraguan president Somoza, was the holder of a check issued to her by a Nicaraguan state bank. Following the overthrow of Somoza, the bank's new directors stopped payment on the check. De Sanchez sued the bank, arguing for exceptions to immunity under sections 1605(a)(3) (takings) and 1605(a)(5) (tort). After rejecting the takings claim, the court declined to consider the allegations sounding in tort.

Citing *Myers,* the court held that De Sanchez's claim

> is not the type of tort claim that the [section 1605(a)(5) ] exception was intended to cover. Mrs. Sanchez's claim, although sounding in tort, is essentially a claim for an unjust taking of property. As noted, Congress has provided an exception in Section 1605(a)(3) for takings of property that violate international law. We do not believe that Congress intended plaintiffs to be able to rephrase their takings claims in terms of conversion and thereby bring the claims even where the takings are permitted by international law.

*Id.* at 1398.

We agree with the reasoning of the Fifth Circuit. Daza's instruction to stop payment to Chuidian, like the bank's refusal to honor De Sanchez's check, is in substance a taking of property, not a tortious injury to property. As such, it should be considered only under the takings exception of section 1605(a)(3). To hold otherwise would be to allow plaintiffs to escape the requirements of section 1605(a)(3) through artful recharacterization of their takings claims.

4.

We conclude that none of the exceptions to sovereign immunity contained in the Act apply to the claim against Daza. Since Daza must be granted immunity as an instrumentality of the Republic of the Philippines, we lack jurisdiction to entertain a suit for alleged misdeeds committed while acting in his official capacity. 28 U.S.C. § 1604. The district court properly dismissed these claims for lack of subject matter jurisdiction.

IV

■ Chuidian argues in the alternative that Daza did not commit the acts complained of while acting in his official capacity. According to Chuidian, Daza acted out of malice against Chuidian, and also acted at the direction of Garcia, an enemy of Chuidian's to whom Daza owed personal favors. Thus, Chuidian contends, we should treat Daza's obstruction of the payment as a private rather than a governmental act.

Plainly Daza would not be entitled to sovereign immunity for acts not committed in his official capacity. We have recognized several circumstances in which a suit against a sovereign's employee is distinct from a suit against the sovereign. Obviously, "[i]f the officer purports to act as an individual and not as an official, a suit directed against that action is not a suit against the sovereign." *Larson v. Domestic and Foreign Commerce Corp.,* 337 U.S. 682, 689, 69 S.Ct. 1457, 1461, 93 L.Ed. 1628 (1949) (*Larson* ). As we stated in *United States v. Yakima Tribal Court,* 806 F.2d 853, 859 (9th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2461, 95 L.Ed.2d 870 (1987), "[i]f an employee of the United States acts completely outside his governmental authority, he has no immunity. An obvious example would be if a dispute occurs pertaining to the sale of an employee's personal house, his government employment provides him with no shield to liability."

Here, however, while Daza may or may not have acted with an individual *motive,* it is clear that in ordering the payment not be made he purported to act as an official, not as an individual. Indeed, only his authority as a member of the Commission enabled him to prevent the payment. Thus, his actions, far from being "completely outside his governmental authority," *id.,* were entirely dependent upon it.

■ Sovereign immunity similarly will not shield an official who acts beyond the scope of his authority. "[W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do...." *Larson,* 337 U.S. at 689, 69 S.Ct. at 1461.

Chuidian argues that Daza was not authorized to use his office for personal purposes, and hence his actions against Chuidian are ultra vires and not subject to immunity. But Chuidian once more confuses the

motive with the actions arising from the motive. Chuidian has not alleged any respect in which Daza's *actions* departed from his statutory mandate. As a member of the Commission, Daza was entitled to investigate possible fraudulent transfers to Marcos associates. Daza clearly had the power to prevent the payment in aid of his investigation; indeed, he had the power to seek an injunction if the Bank refused to comply. *See* Philippine Executive Order 1, § 3(d).

Chuidian does not argue otherwise. Rather, he contends that Daza's personal motive renders his actions ultra vires even though the actions themselves were fully authorized. Under Chuidian's view, every otherwise proper sovereign action would be subject to judicial examination to ensure that the acting officer did not derive some personal satisfaction from the commission of his official duty. There is no authority to support such a radical expansion of the exceptions to sovereign immunity.

The most Chuidian can allege is that Daza experienced a convergence between his personal interest and his official duty and authority. Such a circumstance does not serve to make his action any less an action of his sovereign. Therefore, we hold that the district court did not err in dismissing the claims against Daza in his individual capacity.

### V

Daza argues that the district court erred in declining to sanction Chuidian for bringing this action. We "apply an abuse of discretion standard in reviewing all aspects of a district court's Rule 11 determination. A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.*, — U.S. —, 110 S.Ct. 2447, 2460, 110 L.Ed.2d 359 (1990).

■ Daza raises two grounds for imposing sanctions. First, he argues that it was frivolous to maintain that he was not immune from suit. While some of Chuidian's assertions with regard to immunity were arguably frivolous, others clearly were not. For example, the question of whether the Bank and the Guarantee Corporation could waive Daza's immunity has not previously been addressed in a published opinion. Although we decide against Chuidian on the waiver issue, his contentions could hardly be labeled beyond the bounds of reasonable legal argument. The presence of frivolous arguments or sub-arguments in an otherwise reasonable pleading will not support rule 11 sanctions. *Golden Eagle Distributing Co. v. Burroughs Corp.*, 801 F.2d 1531, 1540–41 (9th Cir.1986). The district court properly declined to award sanctions on this ground.

Daza also alleges a defective service of process, and argues that as a result Chuidian should be sanctioned for continuing the suit in the face of an evident lack of personal jurisdiction. Daza did not argue the lack of personal jurisdiction on appeal, so we do not reach the merits of this controversy. However, our review of the relevant issues as disputed before the district court reveals substantial legal and factual questions surrounding the service of process claim. In our view, Chuidian's contention that process was properly served, while possibly lacking in merit, is not fairly characterized as frivolous.

We conclude, therefore, that the district court did not abuse its discretion in denying Daza's motion for rule 11 sanctions.

AFFIRMED.