**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 98-60288

CORTEZ BYRD; ET AL,

Plaintiffs,

CORTEZ BYRD; SIMMONS LUMBER COMPANY S.A.,

Plaintiffs-Appellees,

versus

CORPORACION FORESTAL Y INDUSTRIAL DE OLANCHO S.A., ET AL,

Defendants,

CORPORACION FORESTAL Y INDUSTRIAL DE OLANCHO S.A.; ISRAEL PACHECO; ALBERTO FIGUEROA,

Defendants-Appellants.

---

GREAT SOUTHERN LUMBER COMPANY LLC, ET AL,

Plaintiffs,

versus

WILLIAM E SIMMONS III, ET AL,

Defendants.

.

Appeal from the United States District Court
for the Southern District of Mississippi

August 10, 1999

Before WISDOM, STEWART, and DENNIS, Circuit Judges.[*]

CARL E. STEWART, Circuit Judge:

Defendants-appellants filed motions to dismiss with the court below, arguing that they are immune from suit pursuant to the Foreign Sovereign Immunities Act ("FSIA"), and because the court below did not have personal jurisdiction over them. The district court denied their motions, and defendants-appellants brought this immediate appeal. We conclude that we have appellate jurisdiction over the district court's decision as to FSIA immunity pursuant to the collateral order doctrine, and AFFIRM that decision by the district court. We also conclude that we do not have appellate jurisdiction over the personal jurisdiction issue, and DISMISS this portion of the appeal.[2]

## FACTUAL & PROCEDURAL BACKGROUND[3]

This case begins with a sawmill in Honduras. The sawmill is owned by defendant-appellant **Corporacion Forestal y Industrial de Olancho, S.A., ("CORFINO")**, a private corporation organized and existing under the laws of Honduras, and which is almost entirely (98% of its shares) owned and controlled by the Republic of Honduras through a governmental entity known as

---

[*]Judge Wisdom was a member of the panel that heard oral arguments, but due to his death on May 15, 1999 did not participate in this decision. This case is being decided by a quorum. See 28 U.S.C. § 46(d) (1996).

[2]In their original brief, appellants had argued that the collateral order doctrine permitted them to bring appellate challenges to personal jurisdiction. In their reply brief, appellants reported to this Court that they had discovered that there existed strong case law against this position. See Appellants Reply Brief at 12 (citing Lauro Lines v. Chasser, 490 U.S. 495, 501 (1989)). In Lauro Lines, the Supreme Court held that an interlocutory order of district court denying a defendant's motion to dismiss based upon a contractual forum selection clause was not immediately appealable under collateral order doctrine. See Lauro Lines, 490 U.S. at 501. In making this decision, the Supreme Court observed that a challenge to venue under a forum selection is as effectively vindicable on appeal as a claim that the trial court lacked personal jurisdiction. See id. As appellants acknowledge, this case appears to conclusively deny appellate jurisdiction, based on the collateral order doctrine, to them. The Court thanks the appellants, and their attorneys, for their candor.

[3]For the ease of the reader, the first mention of either a plaintiff or a defendant is emphasized in bold.

Corporation Hondureña de Desarrolla Forestal ("COHDEFOR"). Running CORFINO at the time the facts alleged in this lawsuit took place are the two remaining defendants-appellants: **Israel Pacheco**, CORFINO's executive vice-president; and **Alberto Figueroa**, CORFINO's President.[4] Both Pacheco and Figueroa are adult resident citizens of Honduras.

Briefly, the factual setting of this case revolves around a power struggle between CORFINO's former business partners as to the control of the sawmill and its accompanying financial rewards. The losers of this struggle are suing the winners on several business-related legal theories, such as breach of contract. Defendants-appellants' relationship to this struggle is at the same time at the center and the outskirts of the struggle: the center, because defendants-appellants own the sawmill in question, and are alleged to have conspired with the other defendants to remove the plaintiffs from their positions in the sawmill's management; and on the outskirts, because defendants-appellants are not alleged to have directly participated in the actions taken against the plaintiffs.

### A

On April 28, 1995, CORFINO leased its chief asset, the sawmill, to defendant **William E. Simmons, III**, an adult resident citizen of Mississippi. Later that year, plaintiff-appellee **Cortez Byrd** was contacted to evaluate and inspect the sawmill in Honduras, to examine lumber for the purpose of determining marketability, and to evaluate the financial feasibility of becoming involved in marketing production from the sawmill.

After Byrd expressed an interest in the sawmill project, several parties entered into a contract designated as a Memorandum of Understanding (hereinafter "Memorandum"). This contract is dated January 1, 1996. Importantly, none of the defendants-appellants are parties to the Memorandum. The parties to the Memorandum are:

(1)　　defendant Simmons;
(2)　　defendant **Great Southern Lumber Company** ("Great Southern"). Great
　　　　Southern is a Mississippi limited liability company, and all of its shares are

---

[4]Figueroa was also sub-gerente general of COHDEFOR. Both Figueroa and Pacheco have been since dismissed from their CORFINO positions due to "irregular activities."

3

owned by American citizens. None of the appellants own part of Great Southern. Byrd was at this point CEO of Great Southern, but was later removed from this position. Great Southern's existence predated the Memorandum.

(3)   plaintiff **John S. Roberts, Sr**;
(4)   plaintiff **John S. Roberts, Jr.**;
(5)   plaintiff-appellee Byrd;
(6)   plaintiff-appellee **Simmons Lumber Company, S.A.** ("Simmons Lumber"). Simmons Lumber is a private corporation, organized at the time the Memorandum was created, and exists under the laws of Honduras. Simmons Lumber is owned exclusively by American citizens Simmons, Byrd, Roberts Jr., Roberts, Sr., and plaintiff **Doug Grissom**. None of the appellants own part of Simmons Lumber. Byrd was at this point President and CEO of Simmons Lumber, and Grissom was at this point Chief Financial Officer of Simmons Lumber.

After this Memorandum was signed, Simmons assigned his lease in the sawmill to Simmons Lumber. Simmons Lumber was then acquired by Great Southern.

As CEO of Great Southern, as well as President and CEO of Simmons Lumber, Byrd contends that the sawmill project offered him a potentially large financial reward. He claims he was to receive a $30,000 fee for bringing the mill into operation, reimbursement of expenses, full authority over the mill's operations, a fixed amount per thousand feet of board produced by the mill, a monthly salary in the event no logs were available, and certain options to purchase stock in Simmons Lumber or Great Southern. Appellants note that they were not the ones who owed these payments to Byrd.

**B**

In June 1996, defendant-appellant Pacheco met with Byrd, Grissom, and Gary Stewart in his Honduras office, and agreed to form a company called PROSEMA. PROSEMA purchased edges sawn off from timbers at the sawmill, at a very low price, to be used to process broomsticks. However, PROSEMA failed to pay Simmons Lumber a debt of $22,000. In September 1996, Byrd (as Great Southern's CEO and president, and as Simmons Lumber's CEO) cut off PROSEMA's credit.

Plaintiffs-appellees Byrd and Simmons Lumber allege that this event triggered a series of retaliatory actions against them. That same month, defendant **John Pearson** allegedly began colluding with the other defendants, in particular defendants Simmons and **Carl Swan**, to oust Byrd

4

from his management position and illegally take over the sawmill project. Both Pearson and Swan are adult resident citizens of Oklahoma. In September and October 1996, Pearson traveled to Honduras and allegedly conspired with the defendants – including defendants-appellants – in a series of "secret meetings" to illegally act in furtherance of a scheme to take over the mill.

In late October, 1996, Byrd discovered that one of the secret meetings was to take place. Byrd alleges that, as CEO of Simmons Lumber, he instructed Simmons not to meet with defendant-appellant Figueroa. When it became clear that Simmons planned to attend, Byrd sent a letter to defendant-appellant Figueroa in which he authorized a Honduran attorney by the name of Cesar Gonzalez to appear at all meetings on behalf of Simmons Lumber. Defendants refused to allow the attorney to attend, however, and at the meeting allegedly made sensitive decisions regarding the mill and the CORFINO lease.

On November 8, 1996, Pearson allegedly hand-delivered a letter to the Board of Directors for Simmons Lumber and Great Southern, in which he stated his objective to obtain an ownership interest in both companies and proposing a breach of the Memorandum whereby he would replace Grissom as Chief Financial Officer, while Simmons would replace Byrd as CEO and Chairman. Pearson further proposed that an executive committee be formed, and that it include Pearson, Swan, Simmons, and Roberts, Sr. According to the proposal, the executive committee would run the operation of the companies with limited involvement in management by the Board of Directors. The proposal also called for the appointment of defendant **Oscar Alvarenga** as Simmons Lumber's attorney in Honduras, and that he be authorized and directed to correct or void the minutes of past Board of Directors' meetings, on file in Honduras.

On January 28, 1997, Simmons, Swan, and other unspecified individuals called together a managers meeting for Great Southern. There, they terminated Byrd's services. None of the defendants-appellants were at this meeting.

In roughly the same time period, defendants-appellants allegedly began complaining that the CORFINO lease, which at this point was assigned to Simmons Lumber, was in jeopardy due to

5

noncompliance with certain lease terms. Plaintiffs contend that this complaint was without foundation. Plaintiffs also allege that defendant Simmons began colluding with CORFINO officials, including defendants-appellants Figueroa and Pacheco, to undermine the CORFINO lease in order to oust plaintiff-appellee Byrd from his position as CEO and general manager of the sawmill project. Plaintiffs further contend that this collusion ultimately resulted in appellant CORFINO issuing a sixty day notice to Simmons Lumber in March 1997, instructing Simmons Lumber that it would cancel the lease if the lease noncompliance were not cured. Plaintiffs also allege that defendant Simmons "signed off" on this notice prior to its issuance by CORFINO, and that Simmons withheld notifying plaintiffs about the 60 day notice for an additional seven days. According to plaintiffs, this delay deprived them of an opportunity to address and cure the alleged deficiencies, and thus constituted actions in furtherance of a fraudulent scheme to take over the sawmill project.

Immediately prior to the issuance of this notice, plaintiffs allege that Glenn Taylor, an attorney representing Simmons, Pearson, and Swan, mailed illegal minutes and other fraudulent misrepresentations to the State Bank and Trust in Mississippi. Taylor also allegedly provided similar material to Bob Riley, of the United States Embassy located in Tegucigalpa, Honduras. These documents were allegedly sent with the knowledge of all of the defendants, including appellants, and were intended to convince Bank and Embassy officials that Simmons controlled Simmons Lumber's management. Plaintiffs also allege that Simmons and defendant **Myra Berlioz**, an adult citizen of Honduras, had previously presented fraudulent documentation to Riley representing that Simmons was in control of Simmons Lumber.

On March 15, 1997, the defendant corporation **Maderas de Exportacion, S.A. ("MADEXPO")** was formed in the Republic of Honduras.[5] The vice-president of MADEXPO is defendant Swan. None of the appellants are on the MADEXPO board of directors, nor do they own any part of MADEXPO. On March 16, 1997, Simmons Lumber assigned its lease to MADEXPO.

---

[5]Appellants and appellee disagree as to whether this company is legally valid under Honduran law.

6

Plaintiffs contend that Simmons did this by purporting to act as President of the Board of Directors of Simmons Lumber. Plaintiffs contend that this assignment occurred without CORFINO's prior approval, as required by the lease, and led to Simmons instituting "an armed takeover of the sawmill complex." See Blue Brief, at 16; Red Brief at 14. During this takeover, plaintiff-appellee Byrd alleges that Simmons stole $50,000 worth of lumber belonging to Simmons Lumber. Byrd also alleges that this act constituted "international terrorism" and that he was assaulted and denied access to the mill by the armed guards under Simmons' control.

In sum, plaintiffs-appellees contend that they suffered significant monetary damage as a result of the illegal scheme to oust Byrd from his management positions. They allege (1) tortious interference of the Memorandum; (2) interference with business opportunity; (3) conspiracy to interfere with contract and business relations; (4) conversion of property; (5) conspiracy to convert property; (6) breach of contract; (7) breach of the duty of good faith and fair dealing with respect to the Memorandum; (8) breach of fiduciary duty by Simmons; (9) conspiracy by defendants to breach fiduciary duty; and (10) RICO violations. Among other damages, Plaintiffs-appellees claim damages for: (1) failing to receive benefits under the Memorandum; (2) Byrd being ousted from his management positions at Great Southern and Simmons Lumber; (3) the theft of lumber from Simmons Lumber; (4) loss of money due to the repayment of loans and the payment of insurance policies; and (5) loss to business in the form of investors, customers, etc.

## C

On April 30, 1997, CORFINO sent Yuri Melara Berlioz (defendant Myra Berlioz's nephew) from Honduras to Mississippi. Pursuant to a letter issued by appellant Pacheco, Berlioz attempted to collect approximately $55,000 from a bank guaranty issued by State Bank & Trust Company in Brookhaven, Mississippi. This bank guaranty had been issued in favor of CORFINO to secure the obligations of Simmons Lumber to pay for utilities under the lease. The CORFINO lease had required the lessee to obtain, inter alia, financial security in the form of a bank guaranty for monies owed to the local power company that provides electricity to the mill. Importantly, CORFINO alleges

7

it had requested that a Honduran bank be used, but Simmons Lumber decided to use a Mississippi bank. Plaintiffs allege that appellants knew and accepted the use of the Mississippi bank. When Berlioz attempted to cash in the guaranty, the bank refused to issue any funds to the Berlioz or CORFINO.

**D**

Plaintiffs filed their complaint against all of the defendants on May 14, 1997 in Mississippi state court. On June 13, 1997, all of the defendants filed their notice to remove. Removal was successfully predicated upon: (1) 28 U.S.C. § 1441(a), as plaintiffs' claims include alleged RICO violations; and (2) § 1441(d), as defendants-appellants CORFINO, Figueroa, and Pacheco each qualify as an agency or instrumentality of a foreign state under 28 U.S.C. § 1603(b). The case then moved to federal district court in the Southern District of Mississippi.

On July 21, 1997, defendants-appellants CORFINO, Figueroa, and Pacheco filed their motion to dismiss, contending they were immune from suit pursuant to the Foreign Sovereign Immunities Act ("FSIA") and that the federal district court lacked personal jurisdiction over them. On July 29, 1997, their motion was supplemented with affidavits. On March 31, 1998, the district court denied their motions to dismiss. Defendants-appellants filed their notice of appeal to this court on April 13, 1998 – thirteen days after their motion to dismiss was denied.

**APPELLATE JURISDICTION**

Where the district court denies a party's motion to dismiss on the grounds of FSIA immunity, that order is immediately appealable under 28 U.S.C. § 1291 and the collateral order doctrine. See, Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo General del Sindicate Revolucionairo de Trabajabores Petroleros de Law Republica Mexicana S.C., 923 F.2d 380, 385 (5th Cir. 1991). Appellees agree to this general rule, but contest the rule's application in this particular case on two grounds.

**A**

8

Appellees contend that the appeal in this case was not perfected because it was not timely filed. The notice to appeal in this case was filed thirteen days after the district court denied their motion to dismiss. Appellees contend that this is three days over the time required in FED. R. APP. P. 5(a), which requires notices of appeals from interlocutory orders in ten days. Appellees also observe that Rule 5 requires appellants to have filed several other documents, which were not done in this case; for instance, Rule 5(a) requires that this notice be in the form of a petition for permission to appeal.

The flaw in this argument, however, lies in the fact that this case is not governed by Rule 5 at all. Instead, it is governed by Rule 4. The former Rule concerns appeals brought under 28 U.S.C. § 1292(b), whereas the latter Rule governs appeals brought under 28 U.S.C. § 1291. As noted earlier, the appeal at bar has been brought under the collateral order doctrine pursuant to § 1291.

Appellees' argument to the contrary is unpersuasive. Appellees contend that our conclusion is wrong as appeals taken pursuant to the collateral order doctrine are not challenging a final order under § 1291. See Stena Rederi, 923 F.2d at 385 (distinguishing between appeals of final orders under § 1291 and appeals brought under the collateral order doctrine). Rather, appellees contend that they are interlocutory appeals, and thus subject to all of the usual appellate rules governing interlocutory appeals. See United States v. Moats, 961 F.2d 1198, 1293 (5th Cir. 1992).

Appellees, however, overlook a critical portion of Moats. While we said in Moats that appeals taken pursuant to the collateral order doctrine are subject to all of the usual appellate rules governing interlocutory appeals, we also specifically identified Rule 4. See id. Moreover, it would turn the collateral order doctrine on its head to suggest that it is derived from § 1292(b) as opposed to § 1291. See Lauro Lines v. Chasser, 490 U.S. 495, 498 (1989) ("Section 1291 thus permits an appeal only if an order denying a motion to dismiss based upon a forum-selection clause falls within the "narrow exception to the normal application of the final judgment rule [that] has come to be known as the collateral order doctrine.'") (quoting Midland Asphalt Corp. v. United States, 489 U.S. 794, 798

(1989).  Therefore, we find no reason to subject appellants to the rigors of 1292(b) certification via Rule 5.  See Weir v. Propst, 915 F.2d 283 (7th Cir.  1990) (Posner, J.) (agreeing with this result).

**B**

Next, appellees contend that factual questions preclude appellate jurisdiction over the FSIA immunity question.  Appellees point to five factual issues that remain in dispute which, they say, prevent us from reviewing the district court's order denying the motion to dismiss.

This is, at first glance, a tricky issue.  In Moats, we noted that "we have authority to decide *only* legal issues when we review an appeal from a collateral order." 961 F.2d at 1202 (emphasis added) (citing Mitchell v. Forsyth, 472 U.S. 511, 527-528 (1985)).[6]  This decision plainly implies, although it does not actually decide, that we would be precluded from asserting appellate jurisdiction over this immediate appeal from the interlocutory order if there were factual issues in dispute.  However, the Moats court also explains that we need not confront this issue if we conclude  that the asserted factual disputes are not relevant to the question of whether FSIA immunity exists.  See 961 F.2d at 1202 (emphasis added) (finding that "there is no real dispute over the facts *relevant* to the existence of immunity" and thus asserting appellate jurisdiction).  We therefore proceed to this preliminary inquiry.

Appellants claim that they are "foreign states" as defined by the FSIA, see 28 U.S.C. § 1603, and are thus immune from suit in federal district court.  They also claim that they do not lose their immunity through the "commercial activity exception" to the FSIA, as appellees charge.  28 U.S.C. § 1605(a)(2).  To assess if there are factual disputes relevant to our subject matter jurisdictional analysis under the FSIA, we must place the appellees' factual disputes alongside  the jurisdictional facts which must exist as a minimum for us to rule, and then determine if there is any overlap. Such

---

[6]But see Brown v. Valmet-Appleton, 77 F.3d 860, 862 & n.6 (5th Cir. 1996) (reviewing for "clear error" the factual findings of a district court's interlocutory order denying a motion to dismiss based on FSIA immunity) (citing Walter Fuller Aircraft Sales v. The Republic of the Phillippines, 965 F.2d 1375 (5th Cir. 1992)).  As Moats was handed down before both Brown and Walter Fuller, however, we are bound by the earlier panel's decision.  See Goodwin v. Johnson, 132 F.3d 162, 175 (5th Cir. 1997) (citing Ryals v. Estelle, 661 F.2d 904, 906 (5th Cir. Nov. 1981)).

overlap would mean that the jurisdictional facts are controverted, and force us to decide whether to remand, decide the factual issues ourselves (as appellants suggest in the alternative), or to dismiss this appeal for lack of appellate jurisdiction. On the other hand, the lack of overlap would mean that the jurisdictional facts are uncontraverted and that, like the Moats court, we can take appellate jurisdiction over this case.

First, appellees claim that there is a factual dispute as to whether appellants Figueroa and Pacheco's actions were taken in their official capacities as CORFINO officials. We acknowledge that this issue is at the heart of whether Figueroa and Pacheco are "foreign states" as defined by the FSIA. Therefore, this would be relevant to our subject matter jurisdictional analysis. However, appellees are mistaken to describe this as a factual dispute. Indeed, it is more akin to a mixed question of law and fact in which the facts are uncontraverted. As will be discussed below, appellees claim that Figueroa and Pacheco were not acting within their "official capacity" because they were acting out of personal motives. Appellants concede (by not directly challenging the claim in their motion to dismiss or attached affidavits) for purposes of subject matter jurisdiction that they were acting out of personal motives, but argue that this fact is legally insufficient to render their "official capacity" status as invalid. As the fact underlying our jurisdictional inquiry on this point is undisputed, we have a green light as to this "factual" dispute.

Second, appellees claim that there are factual disputes as to (1) whether Simmons Lumber alone, or acting with CORFINO, made the decision to agree on a bank guarantee issued by the Mississippi bank, and (2) whether or not CORFINO preferred and requested a Honduran bank. Appellees argue that these factual disputes are relevant to the issue of whether appellants qualify under the "act performed in the United States" clause of commercial activity exception. We acknowledge that these factual disputes are related to appellees' argument on this issue, which rests exclusively upon CORFINO's act in sending its agent Yuri Melara Berlioz to Mississippi to make a bank demand on a bank guarantee issued by the State Bank and Trust in Brookhaven, Mississippi. However, we find that this relationship is best described as tangential; no one disputes Berlioz took

11

the trip to Mississippi and why. This uncontraverted fact is enough for us to conduct our FSIA jurisdictional inquiry.

Finally, appellees claim that there are factual disputes as to (1) whether or not appellants were involved or knew of the "secret meetings" that took place in Honduras, and (2) whether or not appellants Figueroa and Pacheco colluded with the other defendants to issue the sixty day notice referenced in the complaint. Appellees argue that the factual disputes preclude us from properly analyzing whether the third clause of the commercial activity exception applies. To obtain subject matter jurisdiction over appellants under the "direct effect" clause of commercial activity exception, appellees point to five acts which took place in Honduras but had a "direct effect" in the United States. They are:

1. Appellants' leasing the sawmill, which produces and sells woods products;
2. Appellants' knowledge that Byrd and others would obtain a loan of $1 million to refurbish the mill;
3. Appellants' request of proof of Byrd and Simmons Lumbers' good financial standing;
4. Appellants' knowledge that the lease required the appellees would acquire fire insurance (worth $2 million), a bank guarantee to cover utilities (worth $55,000); and
5. Appellants' knowledge and implicit consent, every step of the way, that Americans were being involved in the project.

Examining each of these alleged disputes, it becomes quickly apparent that none have to do with the asserted bases for subject-matter jurisdiction. None are referenced or even mentioned in any of the five asserted bases for subject-matter jurisdiction. We do not believe that they are even tangentially related, and find that they do not preclude our appellate jurisdiction.

As the facts necessary for our subject matter jurisdictional inquiry are uncontraverted, we hold that we have appellate jurisdiction over this appeal under the collateral order doctrine. As did the Moats court, we now proceed directly to the merits of the case.

**DISCUSSION**

12

"The general rule under the FSIA is that foreign states are immune from the jurisdiction of the United States Courts." Moran v. The Kingdom of Saudi Arabia, 27 F.3d 169, 172 (5th Cir. 1994). "However, a district court can exercise subject matter jurisdiction over a foreign state if one of the statute's exceptions apply." Id. The party claiming FSIA immunity, in this case appellants, have the initial burden of proof of establishing a prima facie case that it satisfies the definition of a "foreign state" within the meaning of the FSIA. See id. Once this prima facie case is established, the burden of production shifts to the non movant, in this case the appellees, to raise the exceptions and prove that they apply in this case. See id. Nevertheless, the party claiming FSIA immunity retains the ultimate burden of persuasion throughout. See id.

## I

The threshold issue is whether the party claiming FSIA immunity is a "foreign state" within the meaning of the statute.

> (a)     A "foreign state" . . .  includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).
> (b)     An "agency or instrumentality of a foreign state" means any entity –
>   (1)      which is a separate legal person, corporate or otherwise, and
>   (2)      which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
>   (3)      which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603.   Appellees concede that CORFINO, a Honduran corporation whose stock is almost entirely in the hands of a Honduran governmental entity, is a foreign state for purposes of the FSIA.  However, appellees argue that appellants Pacheco and Figueroa, both officers in CORFINO, do not similarly fall within the definition of a foreign state.

Normally, the FSIA extends to protect individuals acting within their official capacity as officers of corporations considered foreign sovereigns. See, e.g., El-Fadl v. Central Bank of Jordan, 75 F.3d 668, 671 (D.C. Cir.  1996). The FSIA's protections cease, however, when the individual officer acts beyond his official capacity. See Chuidian v. Philippine National Bank, 912 F.2d 1095,

13

1106 (9th Cir. 1990) ( "An obvious example would be if a dispute occurs pertaining to the sale of an employee's personal house, his government employment provides him no shield to liability.").

Appellees argue that Pacheco and Figueroa acted beyond their official capacity, and therefore fall outside the shelter of the FSIA. Appellees claim that Figueroa and Pacheco's conduct demonstrates that they acted out of personal gain and that they subverted their official positions to advance their personal objectives. In particular, appellees allege that Figueroa and Pacheco were acting in retaliation against Byrd and Simmons Lumber, who had discontinued credit to their private company PROSEMA. These allegations, however, are not legally sufficient to strip FSIA immunity from Pacheco and Figueroa. See Chuidian, 912 F.2d at 1106-07. In Chuidian, the Ninth Circuit rejected the argument that personal motives convert an official action into an individual one. The court observed that "[t]he most [plaintiff] Chuidian can allege is that [defendant] Danza experienced a convergence between his personal interest and his official duty and authority." Id. at 1107. "Such a circumstance does not serve to make his action any less an action of his sovereign." Id. The Ninth Circuit reasoned that:

> . . . Chuidian once more confuses the motive with the actions arising from the motive . . . . Under Chuidian's view, every otherwise proper sovereign action would be subject to judicial examinations to ensure that the acting officer did not derive some personal satisfaction from the commission of his official duty. There is no authority to support such a radical expansion of the exceptions to sovereign immunity.

We adopt the reasoning of Chuidian and thus reject the contrary argument by the appellees.

## II

Having established that each appellant is a "foreign state" as defined by the FSIA, we now examine whether any of the appellants lose that immunity pursuant to one of the statute's several exceptions. Appellees contend that the commercial activity exception to the FSIA strips each appellant of their immunity.[7]

---

[7]That exception provides:

    (a) A foreign state shall not be immune from the jurisdiction of courts of the United
        States or of the States in any case –

14

The commercial activity exception to the FSIA provides subject matter jurisdiction over foreign sovereigns when the plaintiff's claim has a sufficient connection, or more precisely a "jurisdictional nexus," with the United States. See Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo General del Sindicate Revolucionairo de Trabajabores Petroleros de Law Republica Mexicana S.C., 923 F.2d 380, 386 (5th Cir. 1991). There are three types of acts which satisfy this jurisdictional nexus requirement:

(1)     a commercial activity carried on in the United States;
(2)     an act performed in the United States in connection with a commercial activity carried on outside the United States; and
(3)     a commercial activity carried on outside the United States that has a direct effect in the United States.

28 U.S.C. § 1605(a)(2). In addition, "there must be a connection between the plaintiff's cause of action and the commercial acts of the foreign sovereign." Stena Rederi, 923 F.2d at 386. This connection is critical. "Isolated or unrelated commercial actions of a foreign sovereign in the United States are insufficient to support a commercial activities exception to sovereign immunity." Id. at 387. Instead, the connection "must be material." Id.

Appellees attempt to establish subject matter jurisdiction through the latter two clauses of § 1605(a)(2). We addresses each in turn.

**A**

As for the second clause of § 1605(a)(2), appellees rely on CORFINO's act in sending its agent Yuri Melara Berlioz to Mississippi to make a demand on a bank guarantee issued by the State Bank and Trust in Brookhaven, Mississippi. This act was performed in the United States, and undeniably has connection with CORFINO's business activities conducted in Honduras. As such,

---

(2) in which the action is based upon a commercial activity carried on in the United States by a foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

15

appellee argue this act provides the jurisdictional nexus to establish subject matter jurisdiction over the appellants.

We cannot agree. The act specified in second clause of § 1605(a)(2) is "generally understood to apply to *non-commercial* acts in the United States that relate to commercial acts abroad." Voest-Alpine Trading USA Corp. v. Bank of China, 142 F.3d 887, 892 n.5 (5th Cir.) (emphasis added), cert. denied 119 S.Ct. 591 (1998). Because appellees point to an exclusively commercial action in the United States they have not proven this exception applies. Perhaps more importantly, appellants also argue that this unconsummated demand on the Mississippi bank has nothing to do with the appellees' contract, tort, property, and RICO claims. As such, we decline to find subject matter jurisdiction on the basis of this act.

**B**

Next, appellees contend that appellants' Honduras business activities, upon which the complaint was based, had a direct effect in the United States, and that these activities serve as a jurisdictional nexus for our subject matter jurisdiction. Appellees point to five business activities:

(1)      Appellants' leasing the sawmill, which produces and sells woods products;
(2)      Appellants' knowledge that Byrd and others would obtain a loan of $1 million to refurbish the mill;
(3)      Appellants' request of proof of Byrd and Simmons Lumbers' good financial standing;
(4)      Appellants' knowledge that the lease required the appellees would acquire fire insurance (worth $2 million), a bank guarantee to cover utilities (worth $55,000); and
(5)      Appellants' knowledge and implicit consent, every step of the way, that Americans were being involved in the project.

In making this argument, appellees rely heavily on our decision in Voest-Alpine Trading USA Corp. v. Bank of China, 142 F.3d 887 (5th Cir.), cert. denied 119 S.Ct. 591 (1998). In Voest-Alpine, we held that a nontrivial financial loss to a plaintiff was sufficient to confer the district court with subject matter jurisdiction. See id. at 897. There, an American corporation brought an action against the Bank of China when that bank refused to honor a letter of credit it had issued to the benefit of the American corporation. See id. at 890. The plaintiff corporation had instructed the defendant bank

16

to wire the $1.2 million to plaintiff's Texas bank.  See id. at 890.  We found that the failure to pay on a letter of credit caused a direct effect in the United States because "Voest-Alpine's nonreceipt of funds in its Texas bank account followed as an immediate consequence of the Bank of China's actions." Id. at 896.

Appellants submit that Voest-Alpine is distinguishable.  In that case, the plaintiff and defendant had a relationship between themselves.  See id. at 890.  In the instant appeal, say appellants, the appellees had a relationship with others, who in turn had a contractual relationship with appellants.  The lease connecting them had another party (defendant Simmons) as the lessee, and appellees only entered into the scene as an assignee.  This renders the relationship indirect.

Appellants rightly acknowledge that there is a danger of expanding the third clause of § 1605(a)(2) to include too much.  See id. at 897 (Reavley, J., concurring) ("If the mere financial loss resulting from the breach or tort satisfies the statute, an American plaintiff need only prove commercial activity.  Perhaps that was the intent of Congress, but I agree with other circuits.").  On these facts, however, we cannot agree with the appellants. According to appellees' allegations, appellants foresaw and perhaps even helped to plan the financial harms which occurred to appellees. There mere fact that appellees were the assignee of the lease at issue does nothing to weaken the relationship between appellees and appellants; appellees' status as assignee means that they replace for all effective purposes the original lessee.  We therefore conclude that the district court correctly asserted subject matter jurisdiction over the appellants under this clause of the commercial activity exception to the FSIA..

## CONCLUSION

For the reasons set forth above, we assert appellate jurisdiction over part of the appeal, DISMISS the remainder, and AFFIRM the relevant decision of the district court.

17