CUDAHY, Circuit Judge,
dissenting in part.
The majority remands this case because, though General Abubakar may not claim sovereign immunity for alleged human rights abuses, “[t]he plaintiffs before us have not pled under the Torture Victim Protection Act and nothing in the record indicates that they'have exhausted their remedies.” Maj. Op. at 886. While I agree that the defendant General Abuba-kar ultimately cannot claim sovereign immunity for the acts of torture and extrajudicial killing alleged in this case, I cannot agree that plaintiffs’ suit is precluded by their failure to bring a claim under the Torture Victim Protection Act of 1991 (TVPA) or by their failure to exhaust legal remedies in Nigeria.
The Relationship Between the ATCA and the TVPA
The majority’s opinion raises an important legal question: whether the TVPA, 28 U.S.C. § 1350, note, P.L. 102-256, effectively restricts or precludes an alien’s ability to bring claims for torture or extrajudicial killing under the Alien Tort Claims Act (ATCA), 28 U.S.C. § 1350.[1] A host of factors strongly indicate that it does not.
First, both the plain text and the legislative history of the TVPA indicate that it was meant to expand, not restrict, the *887 remedies available under the ATCA. The text of the TVPA itself contains no implicit or explicit repeal of the ATCA, nor does it indicate a Congressional intent to limit or supercede the ATCA in any way. . It is a long-standing canon of statutory construction that repeals by implication are disfavored: “Where there are two acts upon the same subject, effect should be given to both if possible .... the intention of the legislature to repeal must be clear and manifest; otherwise, at least as a general thing, the later act is to be construed as a continuation of, and not a substitute for, the first act.” Posadas v. Nat’l City Bank of New York, 296 U.S. 497, 603, 56. S.Ct. 349, 80 L.Ed. 351 (1936);[2] see also Branch v. Smith, 538 U.S. 254, 273, 123 S.Ct. 1429, 155 L.Ed.2d 407 (2003) (“absent a clearly expressed congressional intention ... repeals by implication are not favored”) (internal quotations omitted); Morton v. Mancari, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (same rule). Additionally, as the majority notes, the TVPA itself was codified as part of the Historical and Statutory Notes of the ATCA. See Maj. Op. at 884 n. 1. This also suggests that the TVPA was meant to augment or elaborate the ATCA, not replace it.
But even assuming this constructional question cannot be resolved by text and canon alone, the legislative history of the TVPA leaves no doubt about the matter. By its terms the ATCA provides jurisdiction over tort suits brought by aliens only. After Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir.1980), and its progeny made ATCA human rights suits a familiar feature of the federal judicial landscape, Congress enacted the TVPA in 1991 specifically to provide a cause of action for American nationals subject to.torture or extrajudicial killing in foreign countries. In so doing, Congress cited with approval the Filartiga line of cases and stated its intent to augment and expand the ATCA by providing a new cause of action accessible to American victims of brutality abroad. See S.Rep. No. 102-249, at 4-5 (1991); H.R.Rep. No. 102-367(1), at 3-4 (1991). In short, Congress did not seek to displace or circumscribe the ATCA, but rather- to augment and expand its reach[3]. Congressional Reports on the TVPA state that
The TVPA would establish an unambiguous and modern basis for a cause of action that has been successfully maintained under an existing law, section 1350 of the Judiciary Act of 1789 (the Alien Tort Claims Act), which permits Federal district courts to hear claims by aliens for torts committed “in violation of the law of nations.” (28 U.S.C. sec. 1350). Section 1350 has other important uses and should not be replaced. There should also, however, be a clear and *888 specific remedy, not limited to aliens, for torture and extrajudicial killing.
H.R.Rep. No. 102-367(1), at 3 (emphasis added). Turning to the ATCA’s ambiguity regarding a cause of action for human rights claims,[4] the House Report continued:
The TVPA would provide such a grant [of an express cause of action], and would also enhance the remedy already available under section 1350 in an important respect: While the Alien Tort Claims Act provides a remedy to aliens only, the TVPA would extend a civil remedy also to U.S. citizens who may have been tortured abroad. Official torture and summary executions merit special attention in a statute expressly addressed to those practices. At the same time, claims based on torture or summary executions do not exhaust the list of actions that may appropriately be covered [by] section 1350. That statute should remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law.
H.R. Rep No. 102-376(1), at 4. The Senate Report on the TVPA casts the Act in the same light, using virtually identical language. See S.Rep. No. 102-249, at 5.[5] The majority’s contention that the TVPA would be “meaningless” if it did not preempt the ATCA is therefore incorrect — the TVPA still serves its purpose of filling a gap in the ATCA’s coverage by providing a cause of action for American citizens for certain human rights violations. In this respect the TVPA does not even purport to “occupy the entire field” (as the majority claims) and, as Congress itself made clear, the ATCA was to remain intact to function as before.
The two acts thus are not competing provisions but are meant to be complementary and mutually reinforcing (if somewhat coextensive). Federal courts addressing this specific issue have ruled accordingly, holding that the TVPA does not restrict the scope and coverage of the ATCA. See, e.g., Kadic v. Karadzic, 70 F.3d 232, 241 (2d Cir.1995) (“The scope óf Alien Tort Act remains undiminished by enactment of the Torture Victim Act”); Flores v. S. Peru Copper Corp., 343 F.3d 140, 153 (2d Cir.2003) (recognizing that “the TVPA reaches conduct that may also be covered by the ATCA”); Beanal v. Freeport-McMoran, Inc., 197 F.3d 161, 168-69 (5th Cir.1999) (considering separately claims under the ATCA and TVPA that are “essentially predicated on the same claims of individual human rights abuses”); Abebe-Jira v. Ne- *889 gewo, 72 F.3d 844, 848 (11th Cir.1996) (citing the TVPA as confirmation that the ATCA itself confers a private right of action); Hilao v. Estate of Marcos, 108 F.3d 767, 778-79 (9th Cir.1996) (noting that the TVPA codifies the cause of action recognized to exist in the ATCA); Wiwa v. Royal Dutch Petroleum Co. et al., 2002 WL 319887 at *4 (S.D.N.Y. Feb.28, 2002) (concluding that “plaintiffs’ claims under ATCA are not preempted by the TVPA _the TVPA simply provides an additional basis for assertion of claims for torture and extrajudicial killing”); Doe v. Islamic Salvation Front, 993 F.Supp. 3, 7-9 (D.D.C.1998) (recognizing simultaneous claims under the ATCA and the TVPA). Indeed to rule otherwise would implicitly undercut more than twenty years of jurisprudence, inaugurated by Filartiga, which affirms the ATCA’s applicability to human rights suits. The majority has not identified any contrary precedents on this point, and I am not aware of any.
Of course, the Supreme Court addressed the scope of the ATCA quite recently in Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). The majority incredibly casts the Sosa decision as confirming the preclusive effect of the TVPA. See Maj. Op. at 885. Yet in fact the Sosa Court, while cautioning that the set of international norms supporting a cause of action for suits under the ATCA must be construed narrowly, stated that “a clear mandate” for such suits appears in the TVPA. Id. at 2763., Torture and extrajudicial killing were thus cited as paradigmatic examples of international norms that are sufficiently universal and definite to support claims under the ATCA. It would be decidedly odd — indeed it would be grossly misleading — if the Supreme Court, in making such a declaration, meant to remove these very causes of action from the ambit of the ATCA. The majority, in claiming Sosa as authority for the preclu-sive effect of the TVPA, stands Sosa on its head. That case in fact relies on the TVPA as evidence of Congressional acceptance of torture as a norm enforceable via the ATCA. There is nothing, express or implied, in Sosa to suggest anything about preclusion.
In view of the text of the TVPA itself, the circumstances surrounding its passage, the canons of statutory interpretation discouraging repeals by implication, the legislative history of the Act and prevailing judicial rulings on the subject, it is clear that the TVPA was not intended to preempt or restrict aliens’ ability to bring claims for torture and extrajudicial killing under the ATCA. Plaintiffs in the present case should be allowed to bring their claims for these abuses under the ATCA itself, without resorting to the TVPA.
Exhaustion of Remedies:
This brings us to exhaustion of remedies. As the majority notes, the TVPA contains an exhaustion requirement — individuals suing under the TVPA must first exhaust available legal remedies in the place where the alleged misconduct occurred before bringing suit in U.S. court. 28 U.S.C. § 1350, note, § 2(b). . Having given preemptive effect to the TVPA, the majority rules that plaintiffs’ claims are procedurally barred since they have not demonstrated that they' have exhausted their remedies. Maj. Op. at 16. This disposition is. problematic for several reasons.
First, since the TVPA does not preclude or preempt actions brought under the ATCA and the common law for torture or extrajudicial killing, it follows that the specific exhaustion requirement of the TVPA does not apply to ATCA actions in the first place. But, to be sure, incorporating an implicit exhaustion requirement in the ATCA would have something to recom *890 mend it. Doing so would, among other things, bring the Act into harmony with both the- provisions of the TVPA (with which it is at least partially coextensive) and with the acknowledged tenets of international law.[6] And while not directly applicable to the ATCA, the TVPA scheme is surely persuasive since it demonstrates that Congress not only assumed that the exhaustion requirements imposed by customary international law were discernible and effective in themselves, but also'that they should be reflected in U.S. domestic law.[7] Considerations of equity and consistency also recommend this approach since otherwise American victims of. torture would be bound by an exhaustion requirement under the TVPA and foreign plaintiffs could avoid such strictures by pleading under the ATCA.
This question is far from settled, however, and the Supreme Court’s decision in Sosa, though suggestive, offers little guidance. While it recognizes the possibility of reading an exhaustion requirement into the ATCA, the Court states only that it “would certainly consider this [exhaustion] requirement in an appropriate case.” 124 S.Ct. at 2766, n. 21. Other federal courts appear to be less receptive to the idea.[8] In short, it is far from clear that, purely as a matter of United States jurisprudence, the ATGA contains any exhaustion requirement at all.
*891 However, even assuming that an exhaustion requirement should be read into the ATCA, the majority has placed the evi-dentiary burden on the wrong party. Under both the TVPA and public international law, it is the respondent or defendant’s burden to demonstrate that plaintiffs had adequate legal remedies which they did not pursue in the country where the alleged abuses occurred. See S.Rep. No. 102-249, at 10 (“respondent has the burden of raising the nonexhaustion of remedies as an affirmative defense and must show that domestic remedies exist that the claimant did not use.”);[9] accord Hilao, 103 F.3d at 778 n. 5 (quoting S.Rep. No. 102-249, at 9-10); The Velasquez Rodriguez Case, Inter-Am. C.H.R., July 29, 1988, at ¶¶ 57-61, available via http:// www.oas.org (citing The American Convention on Human Rights, Nov. 22, 1969, 1114 U.N.T.S. 143, art. 46). Then, if the defendant “makes a showing of remedies abroad which have not been exhausted, the burden shifts to the plaintiff to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.” S.Rep. No. 102-249 at 10; accord The Velasquez Rodriguez Case, Inter-Am. C.H.R., July 29, 1988, at ¶¶ 57-61, available via http:// www.oas.org.
In the present case Abubakar has raised the non-exhaustion defense, but he appears not to have proven the existence of specific remedies that should have been pursued in Nigeria. On this basis alone Abubakar’s exhaustion defense must fail. See Hilao, 103 F.3d at 778 n. 5 (denying defense of exhaustion where defendant had not carried its evidentiary burden under this burden-shifting scheme); accord The Velasquez Rodriguez Case, Inter-Am. *892 C.H.R., July 29,1988, at ¶ 60, available via http://www.oas.org (state alleging non-exhaustion of remedies must “prove[] the existence of specific domestic remedies that should have been utilized”).
But even if General Abubakar were deemed to have made the requisite showing that specific domestic legal remedies exist, plaintiffs’ suit should still be allowed to proceed. Plaintiffs have introduced evidence that they or their relatives were targeted by the Nigerian government as political enemies, and under such circumstances there was obviously nothing to be gained by filing complaints in the Nigerian courts. The facts of life shed some doubt on the majority’s airy conclusion that African courtrooms would provide a more hospitable forum for these claims than those of Chicago. U.S. government sources reveal that from the year 2000, when Abuba-kar relinquished power, until 2003, when plaintiffs filed the instant suit, the Nigerian judiciary was under-funded, corrupt, subject to political influence and generally unable or unwilling to compensate victims of past human rights abuses. See United States Department of State, Nigeria: Country Reports on Human Rights Practices — 2003 (February 25, 2004), §§ 1(e), 4; United States Department of State, Nigeria: Country Reports on Human Rights Practices — 2000 (February 23, 2001), at §§ 1(e), 4. There can be little doubt but that the legal remedies offered by the Nigerian courts were indeed ineffective, unobtainable, unduly prolonged, inadequate or obviously futile under any applicable exhaustion provisions.
Finally, to the extent that there is any doubt on this issue, both Congress and international tribunals have mandated that such doubts be resolved in favor of the plaintiffs. The Senate Report on the TVPA directs courts to assume that the exhaustion requirement has been met. Since “torture victims bring suits in the United States against their alleged torturers only as a last resort .... the initiation of litigation under this legislation will be virtually prima facie evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the torture occurred.” S.Rep. No. 102-249, at 9-10 (emphasis added). The Report explicitly states that “courts should approach cases brought under the proposed legislation with this assumption” and reminds us that “[t]he ultimate burden of proof and persuasion on the issue of exhaustion of remedies ... lies with the defendant.” Id. at 10 (emphasis added); accord The Velasquez Rodriguez Case, Inter-Am. C.H.R., July 29, 1988, at ¶ 59, available via http:// www.oas.org (“the State claiming non-exhaustion has ah obligation to prove that domestic remedies remain to be exhausted and that they are effective”) (quotation marks omitted).
Immunity
Thus, even if an exhaustion requirement is read into the ATCA, the majority should have proceeded to the merits of the immunity issue rather than remand the case for consideration of pleading and exhaustion questions. As to the immunity issue itself, the district court concluded that the Foreign Sovereign Immunities Act (FSIA) does not apply to individuals, and the majority opinion appears to agree, holding that General Abubakar receives no protection from the Act. See Maj. Op. at 882; cf. Ye v. Zemin, 383 F.3d 620, 625 (7th Cir.2004) (“The FSIA does not ... address the immunity of foreign heads of states. The FSIA refers to foreign states, not their leaders.”).
Of course, the majority of courts of appeals disagree, holding that the FSIA affords immunity to individual foreign officials for legally authorized acts taken in their official capacity. See Velasco v. In *893 donesia, 370 F.3d 392, 398 (4th Cir.2004) (“courts have construed foreign sovereign immunity to extend to an individual acting in his official capacity on behalf of a foreign state”); Park v. Shin, 313 F.3d 1138, 1144 (9th Cir.2002) (“Individual government employees may be considered ‘foreign states’ within the meaning of the FSIA.”); Keller v. Central Bank of Nigeria, 277 F.3d 811, 815 (6th Cir.2002) (“Normally foreign sovereign immunity extends to individuals acting in their official capacities as officers of corporations considered foreign sovereigns.”); Byrd v. Corporacion Forestal y Industrial De Olancho S.A., 182 F.3d 380, 388 (5th Cir.1999) (“Normally, the FSIA extends to protect individuals acting within their official capacity as officers of corporations considered foreign sovereigns.”); El-Fadl v. Central Bank of Jordan, 75 F.3d 668, 671 (D.C.Cir.1996) (“An individual can qualify as an ‘agency or instrumentality of a foreign state’ ” when acting in his official capacity on behalf of the state.); Chuidian v. Philippine Nat’l Bank, 912 F.2d 1095, 1103 (9th Cir.1990) (Concluding that the FSIA “can fairly be read to include individuals sued in their official capacity.”).
Affording immunity to foreign officials for legally authorized acts may be more consonant with the tenets of current international law[10] — not to mention this eoun-try’s own law on immunities for domestic officials[11] — yet under either approach the end result is the same since, even under the more liberal interpretation advanced by the majority of the circuits, officials receive no immunity for acts that violate international jus cogens human rights norms (which by definition are not legally authorized acts). See, e.g., Chuidian, 912 F.2d at 1106 (“Sovereign immunity ... will not shield an official who acts beyond the scope of his'authority.”); Hilao v. Estate of Marcos, 25 F.3d 1467, 1472 (9th Cir.1994) (“acts of torture, execution, and disappearance were clearly acts outside of his authority as President .... Marcos’ acts were not taken within any official mandate and were therefore not the acts of an agency or instrumentality of a foreign state within the meaning of FSIA.”) (citing Chuidian, 912 F.2d at 1106); Trajano v. Marcos, 978 F.2d 493 (9th Cir.1992) (same rule). General Abubakar is therefore not entitled to immunity in any event.[12]
Conclusion
For the foregoing reasons, I would affirm the ruling of the district court and allow this case to proceed.

. This provision has also been referred to as the "Alien Tort Act," see, e.g., Kadic v. Karadzic, 70 F.3d 232, 238 (2d Cir.1995), and the "Alien Tort Statute,” see, e.g., Filartiga v. Pena-Irala, 630 F.2d 876, 880 (2d Cir.1980).

. The Court elaborates on this principle as follows: "There are two well-settled categories of repeals by implication: (1) Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute,' it will operate similarly as a repeal of the earlier act. But, in either case, the intention of the legislature to repeal must be clear and manifest; otherwise, at least as a general thing, the later act is to be construed as a continuation of, and not a substitute for, the first act and will continue to speak, so far as the two acts are the same, from the time of the first enactment.” Posadas, 296 U.S. at 503, 56 S.Ct. 349.

. As at least one court of appeals has also noted, whereas the ATCA speaks only in terms of the jurisdiction of U.S. courts to hear alien tort claims, the TVPA went one step further to - create liability for acts of torture and extrajudicial killing under U.S. law. See Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 104-05 (2d Cir.2000).

. On this score the Report is responding in particular to the concerns raised by Judge Bork in his concurring opinion in Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C.Cir.1984). The Report cites Judge Bork’s opinion specifically. See H.R.Rep. No. 102-367(1), at 4.

. Addressing these same issues, the Senate Report states:
The TVPA would establish an unambiguous basis for a cause of action that has been successfully maintained under an existing law, section 1350 of title 28 of the U.S.Code, derived from the Judiciary Act of 1789 (the Alien Tort Claims Act). . The TVPA would provide such a grant [of a cause of action], and would also enhance the remedy already available under section 1350 in an important respect: while the Alien Tort Claims Act provides a remedy to aliens only, the TVPA would extend a civil remedy also to U.S. citizens who may have been tortured abroad. Official torture and summary executions merit special attention in a statute expressly addressed to those practices. At the same time, claims based on torture or summary executions do not exhaust the list of actions that may appropriately be covered by section 1350. Consequently, that statute should remain intact.
S. Rep. No. 102-249 at 4-5 (footnote omitted).

.Exhaustion of remedies requirements are a well-established feature of international human rights law. See, e.g., I. Brownlie, Principles Or, Public International Law 472-81, 552 (6th ed.2003); The American Convention on Human Rights, Nov. 22, 1969, 1144 U.N.T.S. 143, art. 46; The European Convention for the Protection of Human Rights and Fundamental Freedoms, Nov. 4, 1950, 213 U.N.T.S. 222, art. 26; The Velasquez Rodriguez Case, Inter-Am, C.H.R., July 29, 1988, at ¶¶ 50-73, available via http://www.oas.org. Certainly in applying a statute like the ATCA, where liability is predicated on "violation of the law of nations,” it would seem natural to honor the basic tenets of public international .law. It is also well-established that, as a general proposition, U.S. law should incorporate and comport with international law where appropriate, See F. Hoffman-La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 124 S.Ct. 2359, 2366, 159 L.Ed.2d 226 (2004) (Courts must assume that Congress seeks to comply with customary international law); The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900) ("International law is part of oiir law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination.”); Murray v. Schooner Charming Betsy, 2 Cranch 64, 118, 2 L.Ed. 208 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains”).

. The TVPA’s legislative history reveals that its exhaustion provisions are expressly modeled on those of customary international law, and it sets forth the parameters of the exhaustion analysis with striking clarity. See S.Rep. No. 102-249, at 9-10.

. Apparently no court of appeals has confronted the issue squarely, though the Second Circuit’s decision in Kadic v. Karadzic at least implicitly did so by ostensibly declining to impose an exhaustion requirement on claims for torture and summary execution, even though it was also considering TVPA claims based on the same alleged abuses. 70 F.3d at 241-44. Several federal district courts have made more express rulings to this effect. See Doe v. Rafael Saravia, 348 F.Supp.2d 1112, 1157 (E.D.Cal.2004) ("Plaintiffs asserting claims under the ATCA are not required to exhaust their remedies in the state in which the alleged violations of customary international law occurred.”); Sarei v. Rio Tinto PLC, 221 F.Supp.2d 1116, 1133 (C.D.Cal.2002) ("The court is not persuaded that Congress’ decision to include an exhaustion of remedies provision in the TVPA indicates that a parallel requirement must be read into the ATCA.”) (citing Kadic, 70 F.3d at 241); Jama v. I.N.S., 22 F.Supp.2d 353, 364 (D.N.J.1998) ("There is nothing in the ATCA which limits its application to situations where there is no relief available under domestic law.”).

. The Senate Report on the Torture Victim Protection Act is quite clear on both the specifics of the exhaustion of remedies analysis and its basis in international law:
Cases involving torture abroad which have been hied under the Alien Tort Claims Act show that torture victims bring suits in the United States against their alleged torturers only as a last resort. Usually, the alleged torturer has more substantial assets outside the United States and the jurisdictional nexus is easier to prove outside the United States. Therefore, as a general matter, the committee recognizes that in most instances the initiation of litigation under this legislation will be virtually prima facie evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the torture occurred. The committee believes that courts should approach cases brought under the proposed legislation with this assumption.
More specifically, as this legislation involves international matters and judgments regarding the adequacy of procedures in foreign courts, the interpretation of section 2(b), like the other provisions of this act, should be informed by general principles of international law. The procedural practice of international human rights tribunals generally holds that the respondent has the burden of raising the nonexhaustion of remedies as an affirmative defense and must show that domestic remedies exist that the claimant did not use. Once the defendant makes a showing of remedies abroad which have not been exhausted, the burden shifts to the plaintiff to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile. The ultimate burden of proof and persuasion on the issue of exhaustion of remedies, however, lies with the defendant.
This practice is generally consistent with common-law principles of exhaustion as applied by courts in the United States. See, e.g., Honig v. Doe, 484 U.S. 305, 325-29, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (allowing plaintiffs to by-pass administrative process where exhaustion would be futile or inadequate).
As in the international law context, courts in the United States do not require exhaustion in a foreign forum when foreign remedies are unobtainable, ineffective, inadequate, or obviously futile.
S. Rep. No. 102-249, at 9-10 (footnotes omitted).

. See Regina v. Bow Street Metropolitan Stipendiary Magistrate and Others, Ex Parte Pinochet Ugarte (No. 3), [2000] 1 A.C. 147 (1999) (appeal taken from Q.B.) (ruling that a former head of state enjoys immunity for legally authorized acts taken in his official capacity, but not for acts, such as torture, committed in violation of jus cogens international norms); Case Concerning the Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v. Belgium), I.C.J., February 14, 2002, at ¶ 61, available at http://www.icj-cij.org (confirming that nationál courts may try former foreign officials for acts committed in their private capacities).

. See, e.g., Monell v. Dept. of Soc. Servs., 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

. The foreign policy implications of the immunity question are intensified where a sitting or former foreign head of state is involved. Fortunately, the question of General Abubakar’s immunity for acts taken as Nigeria’s head of state is not before us — General Abubakar has appealed only the district court’s denial of immunity for acts taken as a member of the Nigerian Provisional Ruling Council.